SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No.  CR-05-0005-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No.  CR2000-096032 |
| WENDI ELIZABETH ANDRIANO, | ) |
| | ) |
| Appellant. | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Brian K. Ishikawa, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Capital Litigation Section
          Robert J. Gorman, Jr.,                           Tucson
          Assistant Attorney General
Attorneys for State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER             Phoenix
     By   Brent E. Graham, Deputy Public Defender
          Margaret M. Green, Deputy Public Defender
Attorneys for Wendi Elizabeth Andriano
_____

**B E R C H**, Vice Chief Justice

¶1      In 2004, Wendi Andriano was found guilty of one count of first degree murder and sentenced to death.  This automatic appeal followed.  We have jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001).

- 1 -

# I. FACTS[1] AND PROCEDURAL BACKGROUND

¶2    Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

¶3    At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

¶4    Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

¶5    Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the

---

[1]    We view the facts in the light most favorable to sustaining the verdict. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

¶6        As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

¶7        Andriano called 911 again at 3:39 a.m.  The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

¶8        When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood.  He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter.  A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry.  A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp, a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

¶9        A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide, two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves.  Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement.  Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen.  In all, 20.8 grams of sodium azide could not be accounted for.

¶10       The medical examiner determined that Joe sustained

brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious.  Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack.  Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery.  The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed.  Trace amounts of sodium azide were found in Joe's blood and gastric contents.  The cause of death was attributed to blunt force trauma and the stab wound.

¶11     Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack.  He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died.  Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

¶12     After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office.  Andriano's adoptive father told a

police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

¶13   Andriano was indicted on one count of first degree murder. The State filed a notice of intent to seek the death penalty and subsequently alleged two aggravating factors: that Andriano committed the offense "in expectation of the receipt[] of anything of pecuniary value," in violation of A.R.S. § 13-703(F)(5) (Supp. 2000), and that she committed the murder "in an especially heinous, cruel or depraved manner," in violation of A.R.S. § 13-703(F)(6). The State further alleged that the offense was a dangerous felony, *see id.* § 13-604(P), because it "involved the intentional or knowing infliction of serious physical injury upon Joseph Andriano."

¶14   At trial, Andriano testified that after a failed assisted suicide attempt by poison, she and Joe got into a fight, during which she hit Joe with a bar stool in self-defense. She claimed that he ultimately slit his own throat. The jury found Andriano guilty of first degree murder and further found that the murder was a dangerous felony.

¶15   The same jury found the (F)(6) "especially cruel" aggravating factor, but did not find the (F)(5) "pecuniary gain" aggravator. Finding that the mitigating circumstances were not sufficiently substantial to call for leniency, the jury returned a verdict calling for a sentence of death.

- 6 -

¶16     Andriano raises eleven issues on appeal and lists an additional thirteen claims to avoid preclusion.[2]

## A.  Guilt Phase Issues

### 1.  Admission of other act evidence

¶17     Andriano claims that evidence of her extramarital affairs and her attempts to obtain insurance policies on Joe's life was unfairly prejudicial and was neither intrinsic to the charge against her nor admissible under Arizona Rule of Evidence 404(b).  We review evidentiary rulings for an abuse of discretion.  *State v. McGill*, 213 Ariz. 147, 156, ¶ 40, 140 P.3d 930, 939 (2006), *cert. denied*, 127 S. Ct. 1914 (2007).

¶18     The trial court found the insurance and affairs evidence "intrinsic" to the crime.  "'Other act' evidence is 'intrinsic' when [1] evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or [2] both acts are part of a 'single criminal episode' or [3] the other acts were 'necessary preliminaries' to the crime charged."  *State v. Dickens*, 187 Ariz. 1, 18-19 n.7, 926 P.2d 468, 485-86 n.7 (1996) (quoting *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996)).

---

[2]     The thirteen claims listed to avoid preclusion are appended to this opinion.

### a. Life insurance policies

¶19      After three surgeries to remove a recurring tumor in his salivary gland and as many misdiagnoses, Joe was diagnosed with metastatic adenoid cystic carcinoma in 1998. By that time, the cancer had spread to his lungs and his condition was deemed terminal.

¶20      Nevertheless, during August and September of 2000, Andriano made several attempts to obtain insurance on Joe's life through various companies. During the prescreening process, Andriano claimed that Joe did not have cancer. One agent contacted Joe on September 6 after receiving an electronic pre-application, at which time Joe indicated that he was not interested in applying. Andriano sent an email three days later from her personal email account asking that Joe's request be reinstated and directing that further contact be made with her. She also asked two men to pose as Joe for a life insurance physical exam, one of whom she offered to pay as much as $50,000. Both refused. No life insurance policy was ever obtained through these efforts.

¶21      Andriano's attempts to procure insurance on Joe's life do not fall into any of the three categories of intrinsic evidence. Because she never secured insurance, the attempts to procure it were not inextricably intertwined with Joe's murder, part of a single criminal episode, or a necessary preliminary to

Joe's murder. *See id.* The insurance procurement evidence clearly differs from, for example, evidence deemed intrinsic in *Dickens* that the defendant had stolen the gun used in the charged murders and robberies. *See id.; see also State v. Nordstrom*, 200 Ariz. 229, 248, ¶ 56, 25 P.3d 717, 736 (2001) (commenting on the "necessary preliminary" prong of the intrinsic evidence inquiry).

¶22    Even though not intrinsic to the crime charged, "other act" evidence may nonetheless be admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," as long as its probative value is not substantially outweighed by the danger of unfair prejudice. Ariz. R. Evid. 403; *see also Dickens*, 187 Ariz. at 19, 926 P.2d at 486.

¶23    Evidence of Andriano's attempts to obtain insurance on Joe's life was admissible to show her plan, knowledge, and intent to kill Joe, and also to show that she premeditated Joe's murder. Moreover, the significant probative value of such damaging evidence is not substantially outweighed by the danger of unfair prejudice to Andriano. Because the evidence was admissible under Rule 404(b), the trial court did not abuse its discretion in admitting the evidence, even if it might have admitted the evidence for the wrong reason. *See State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984) (affirming trial

court's ruling even though trial judge reached the proper conclusion for the wrong reason).

### b. Extramarital affairs

¶24 During the summer of 2000, Andriano had a brief extramarital affair with Rick, a resident of the apartment complex where she lived and worked as the property manager. That affair ended in July when Rick learned that Andriano was married and had children. Despite his rejection of her advances, Andriano aggressively pursued Rick. On one occasion, she stood outside his apartment late at night, banging on his door for five minutes, demanding to be let in, and threatening to get the master "pass key" if he did not let her in.

¶25 During that same summer, Andriano frequented bars on a weekly basis with coworkers and friends. There, she was seen dancing and flirting and even groping and kissing men. On September 27, the evening after Joe's fourth chemotherapy treatment, Andriano went to a dance club and began dancing provocatively with and kissing a man she met there. They ultimately returned to the Andrianos' apartment and had sex. During a phone conversation the following day, Andriano told the man her husband had died of cancer.

¶26 Like the insurance evidence, evidence of Andriano's extramarital affairs is not intrinsic to the first degree murder charge. The affairs were not inextricably intertwined with or

part of the same criminal episode as the murder, nor were they a necessary preliminary to the murder. *Dickens*, 187 Ariz. at 18-19 n.7, 926 P.2d at 485-86 n.7. The evidence was admissible under Rule 404(b), however, as evidence of Andriano's motive for killing her husband – to be free to pursue other relationships. Supporting this purpose was testimony from Andriano's hairdresser, who testified that Andriano told her in February of 2000 that she would have divorced Joe were he not ill. At a later visit, Andriano disclosed that Joe "wanted to keep the marriage together," but she was "emotionally out of it" and "wished he was dead so she could move on with her life." Around August of 2000, Andriano confided to the hairdresser that she was interested in another man who hesitated to get involved in a relationship because she was married.

¶27 The evidence was also admissible under Rule 404(b) to rebut the defense theory that Andriano was a domestic violence victim who lived in fear of her abusive husband, whom she bludgeoned to death in self-defense.

¶28 Andriano maintains, nonetheless, that the evidence was unfairly prejudicial because "[t]he prosecutor took every opportunity to infuse the trial with marginally relevant information about Andriano's partying and man-chasing."[3] Nearly

---

[3] Andriano does not allege prosecutorial misconduct.

- 11 -

all the examples Andriano provides relate to the prosecutor's comments in the guilt phase closing arguments. Comments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted.

¶29 Another incident about which Andriano complains occurred during the cross-examination of defense expert Dr. Sharon Murphy. The prosecutor asked Dr. Murphy whether Andriano used a personal lubricant during sexual intercourse with Rick. The door to this line of questioning had been opened by defense counsel's questioning on direct examination, to which Dr. Murphy responded that Andriano and Joe "needed to use a lubricant" during intercourse. Considered in context, the questioning was designed to rebut Dr. Murphy's suggestion, elicited by defense counsel's question, that Andriano's need to use a lubricant when she had sex with Joe showed that Joe was an abusive spouse. The evidence elicited was not unfairly prejudicial.

¶30 The final incident relates to a comment the prosecutor made during aggravation phase closing arguments and therefore is not relevant to whether such evidence was admissible in the guilt phase. The probative value of evidence of Andriano's extramarital relationships is not substantially outweighed by the danger of unfair prejudice, and thus the trial court did not abuse its discretion in admitting the evidence.

¶31     In sum, although neither category of evidence is intrinsic to the crime charged, both categories are admissible under Rule 404(b):    evidence of attempts to procure life insurance to prove plan, knowledge, intent, and premeditation, and evidence of extramarital affairs to prove motive and to rebut the defense theory that Andriano was a domestic violence victim.    The trial court did not abuse its discretion in admitting the evidence.

## 2.    Lesser-included offense instructions

¶32     Andriano argues that the trial court was required sua sponte to instruct the jury on the lesser-included offenses of second degree murder and "sudden quarrel or heat of passion" manslaughter.    Defense counsel did not request any lesser-included offense instructions.    We review a trial court's failure to give lesser-included offense instructions for fundamental error when the instructions are not requested at trial.  *Nordstrom*, 200 Ariz. at 253, ¶ 81, 25 P.3d at 741.    In a capital case, it is fundamental error for the trial court to fail to give a lesser-included offense instruction if one is supported by the evidence, *id.*, *see also Beck v. Alabama*, 447 U.S. 625, 627, 638 (1980), and not waived by the defendant.

¶33     As to second degree murder, Andriano contends on appeal that because sodium azide poisoning did not cause Joe's death, a reasonable jury could have found that she abandoned her

- 13 -

plan to poison Joe. Abandonment is shown, she argues, by her summoning Chris to the apartment and her call to 911. She maintains that a new sequence of events began that led to an intentional or knowing – but not premeditated – death. As to manslaughter, Andriano contends that the evidence supports a conclusion that Joe provoked her when he reached for a knife, and she then killed him during a sudden quarrel or in the heat of passion.

¶34 Andriano did not argue either of these theories at trial, however, and the evidence presented does not support either theory. Andriano testified that she was attempting to assist Joe in committing suicide when they got scared and decided to call for help. She claimed that after 911 was called and Chris left the apartment to meet the paramedics, Joe decided that he wanted to follow through with the suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.

¶35    Despite Andriano's testimony that Joe had killed himself, in closing argument, defense counsel argued that Andriano was a domestic violence victim who acted in self-defense after an assisted suicide attempt. The jury was instructed on self-defense and told that if it found Andriano to be a domestic violence victim, "the state of mind of a reasonable person . . . shall be determined from the perspective of a reasonable person who has been a victim of those past acts of domestic violence."

¶36    We held in *State v. Celaya* that "where the sole defense is self-defense so that the evidence requires either conviction or acquittal, any instruction on any other grade would be impermissible." 135 Ariz. 248, 255, 660 P.2d 849, 856 (1983); *see also State v. Wall*, 212 Ariz. 1, 6, ¶ 29, 126 P.3d 148, 153 (2006) (noting that when defendant asserts an "all-or-nothing" defense, the record usually will not support the giving of a lesser-included offense instruction); *State v. Jones*, 109 Ariz. 80, 81-82, 505 P.2d 251, 252-53 (1973) (holding that lesser-included offense instructions were not required where evidence at trial and defendant's self-defense theory presented an "either-or" situation requiring either first degree murder conviction or acquittal). We conclude that the evidence in this case did not support either a second degree murder or manslaughter instruction and that the trial court therefore did

not commit fundamental error in failing to give either instruction.

**B.    Aggravation Phase Issues**

   1.    Constitutionality of (F)(6) aggravating factor

**¶37**    Andriano argues that the A.R.S. § 13-703(F)(6) "especially heinous, cruel or depraved" aggravator is both facially vague and vague as applied by juries rather than trial judges.    In *Walton v. Arizona*, the United States Supreme Court found Arizona's (F)(6) aggravator facially vague.    497 U.S. 639, 654 (1990), *overruled on other grounds by Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002).    The Supreme Court nonetheless upheld the factor against a constitutional challenge because this Court's narrowing construction of the (F)(6) aggravator "gives meaningful guidance to the sentencer."    *Id.* at 653-55.

**¶38**    Because juries rather than trial judges now find the existence of aggravating factors, *see* A.R.S. § 13-703.01(C) (Supp. 2006), Andriano argues that the judge's knowledge of the narrowing construction cannot save the (F)(6) aggravator from unconstitutional vagueness.    We rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188-89, ¶¶ 40-42, 119 P.3d 448, 455-56 (2005), *cert. denied*, 126 S. Ct. 2291 (2006), and *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 352-53, ¶¶ 109-14, 111 P.3d 369, 394-95 (2005).    "Those cases hold that the (F)(6) aggravator may be constitutionally applied if given substance

and specificity by jury instructions that follow this Court's constructions." *State v. Hampton*, 213 Ariz. 167, 176, ¶ 36, 140 P.3d 950, 959 (2006), *cert. denied*, 127 S. Ct. 972 (2007).

¶39     Andriano also argues that the (F)(6) aggravating factor is unconstitutionally vague when applied by a jury because without proportionality review the jury has no way to determine whether the murder for which it has found the defendant guilty is "above the norm of other first degree murders."   We rejected this argument in *State v. Johnson*, 212 Ariz. 425, 431-32, ¶¶ 19-20, 133 P.3d 735, 741-42, *cert. denied*, 127 S. Ct. 559 (2006).   We similarly reject it here.

   2.   (F)(6) "cruelty" instruction[4]

¶40     The trial court provided the following (F)(6) "cruelty" instruction to the jury:

> "Cruelty" involves the infliction of physical pain and/or mental anguish on a victim before death. A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death.   The victim must be conscious for at least some portion of the time when the pain and/or anguish was inflicted.

---

[4]     The jury found only the cruelty prong of the (F)(6) aggravating factor.   It did not find the murder heinous or depraved.   A finding of any of the three prongs is sufficient to support the (F)(6) aggravating circumstance.   *Cromwell*, 211 Ariz. at 189, ¶ 43, 119 P.3d at 456.

- 17 -

Andriano asserts that this instruction was insufficient to guide the jury and channel its discretion in applying the aggravator.

¶41 The instruction given paraphrases this Court's statement in *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997), that "[c]ruelty exists if the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." (Internal citation omitted.) We recently reaffirmed that the *Trostle* definition of "cruelty" sufficiently narrows and gives substance to the (F)(6) "especially cruel" aggravating factor to save it from constitutional infirmity. *Anderson II*, 210 Ariz. at 352 & n.18, ¶ 109, 111 P.3d at 394 & n.18. We similarly conclude here that the trial court's instruction gave sufficient substance and specificity to the term "cruelty" to channel the jury's discretion and correct any unconstitutional vagueness.[5]

---

[5] Andriano's brief also seems to claim that the evidence was insufficient to support the jury's finding that the murder was "especially cruel." Because we would review sufficiency of the evidence to "determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury['s] verdict," *State v. Roque*, 213 Ariz. 193, 218, ¶ 93, 141 P.3d 368, 393 (2006), and affirm the jury's finding if the evidence is such that "reasonable persons could accept [it] as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt," *id.* (quoting *State v. Roseberry*, 210 Ariz. 360, 369, ¶ 45, 111 P.3d 402, 411 (2005)), the issue is subsumed in our independent review. *See infra* ¶¶ 64-68.

3. "Above the norm of other first degree murders" instruction

¶42 The trial court instructed the jury that the (F)(6) aggravating circumstance "cannot be found to exist unless the murder is especially heinous, cruel or depraved, that is, where the circumstances of the murder raise it above the norm of other first degree murders." Andriano claims that this instruction required the jury to engage in proportionality review, which was improper in light of *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 583 (1992), and *State v. Greenway*, 170 Ariz. 155, 171, 823 P.2d 22, 38 (1991). Because Andriano did not object on this ground at trial, we review only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005).

¶43 We have held that "the death penalty should not be imposed in every capital murder case but, rather, it should be reserved for cases in which either the manner of the commission of the offense or the background of the defendant places the crime 'above the norm of first-degree murders.'" *State v. Carlson*, 202 Ariz. 570, 582, ¶ 45, 48 P.3d 1180, 1192 (2002) (quoting *State v. Hoskins*, 199 Ariz. 127, 163, ¶ 169, 14 P.3d 997, 1033 (2000)). Such an instruction does not require the jury to engage in proportionality review. Instead, the jurors must assess whether the murder was so cruel that it rose above

the norm of first degree murders. To assist them in this inquiry, the judge instructed the jurors on the definition of "cruelty," explaining how to determine whether "the circumstances of the murder raise it above the norm of other first degree murders." Considering the instructions as a whole, the jury was properly instructed to apply the definition of "cruelty," rather than to engage in proportionality review. The trial court did not err, fundamentally or otherwise, in giving the instruction.

## C. Penalty Phase Issues

### 1. Residual doubt mitigation

¶44 The trial court denied Andriano's request to present evidence of residual doubt as a mitigating circumstance in the penalty phase. Andriano claims that the trial court was constitutionally required to allow her to present such mitigation evidence for the jury's consideration. We review alleged constitutional violations de novo. *McGill*, 213 Ariz. at 159, ¶ 53, 140 P.3d at 942.

¶45 Both the United States Supreme Court and this Court have rejected the argument that a capital defendant must be allowed to present residual doubt evidence in mitigation. In *Oregon v. Guzek*, the defendant argued that the Eighth and Fourteenth Amendments granted him a constitutional right to present new alibi evidence at his sentencing proceeding. 546

U.S. 517, ___, 126 S. Ct. 1226, 1230 (2006). The Supreme Court, although not deciding whether such a right exists, held that its previous cases do not grant capital defendants a constitutional right to present evidence of residual doubt at sentencing. *Id.* at ___, 126 S. Ct. at 1231-32. We thus noted in *State v. Ellison* that "there is no constitutional requirement that the sentencing proceeding jury revisit the prior guilty verdict by considering evidence of 'residual doubt.'" 213 Ariz. 116, 136, ¶ 82, 140 P.3d 899, 919 (citing *Guzek*, 546 U.S. at ___, 126 S. Ct. at 1230-32), *cert. denied*, 127 S. Ct. 506 (2006). The trial court did not err in denying Andriano's request to present residual doubt evidence in mitigation.

### 2.   Mercy mitigation

**¶46**      The trial court also denied Andriano's request to include "mercy" among the enumerated mitigating circumstances for the jury's consideration. Andriano maintains that the trial court was constitutionally required to allow her to do so. We disagree.

**¶47**      Arizona Revised Statutes § 13-703(G) (Supp. 2004) provides that mitigating circumstances are "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." The

- 21 -

defendant bears the burden of proving mitigating circumstances by a preponderance of the evidence. *Id.* § 13-703(C). The defendant cannot, however, prove "mercy" by any standard, nor does it relate to the character or propensities of the defendant or the circumstances of the crime. Therefore, mercy is not a mitigating circumstance.

¶48 Mercy is a concept jurors may apply in evaluating the existence of mitigating circumstances and in deciding whether the death penalty is appropriate in a particular case. In this sense, "mercy" is simply another word for "compassion" or "leniency." A capital defendant is free to argue to the jury, as the defense did here, that mercy or leniency is appropriate based on the mitigation evidence presented.

¶49 The instructions given in this case correctly conveyed the role of mercy in determining the appropriate sentence. The trial court did not err in refusing Andriano's request to include mercy among the enumerated mitigating circumstances for the jury's consideration.

3. <u>Jury unanimity in determining mitigating circumstances</u>

¶50 The trial court instructed the jury in the penalty phase as follows:

> Any verdict of death or life imprisonment must be unanimous. If you unanimously find that no mitigation exists, then you must return a verdict of death. *If you unanimously find that mitigation exists*, each one of you must individually weigh that mitigation in

light of the aggravating circumstance already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death. *If you unanimously find that mitigation exists* and it is sufficiently substantial to call for leniency, you must return a verdict of life.

(Emphasis added.) Andriano claims that this instruction improperly required the jury to unanimously find particular mitigating circumstances before each juror could individually consider whether that mitigation was sufficiently substantial to call for leniency. We review the challenged instruction de novo and consider the instructions as a whole "to ensure that the jury receives the information it needs to arrive at a legally correct decision." *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 471, ¶ 8, 123 P.3d 662, 665 (2005).

¶**51** Each juror in a death penalty case must individually determine whether any mitigating circumstances exist. A.R.S. § 13-703(C); *see Baldwin*, 211 Ariz. at 472, ¶ 13, 123 P.3d at 666; *see also Ellison*, 213 Ariz. at 139, ¶ 102, 140 P.3d at 922 (discussing Supreme Court cases holding that capital sentencing statutes may not require unanimity as to mitigating circumstances). Then, in light of the aggravating circumstances the jury has already found to exist, each juror must individually determine whether the mitigation that juror has found to exist is sufficiently substantial to call for leniency. *See* A.R.S. § 13-703(C), (E); *Baldwin*, 211 Ariz. at 473, ¶ 18,

- 23 -

123 P.3d at 667.

¶52    Read as a whole, the instructions given here correctly advised the jurors that they did not have to agree upon the existence of any particular mitigating circumstance before each juror could individually assess whether the mitigation was sufficiently substantial to call for leniency.  The court repeatedly advised them during the penalty phase that each juror was required to "individually" determine the existence of mitigating circumstances.[6]  We therefore conclude that the trial

---

[6]    Before being given the instruction to which Andriano objects, the jurors had been instructed as follows:

> Although a final decision on a penalty of death or life imprisonment must be unanimous, the determination of what circumstances are mitigati[ng] is for *each one of you to resolve, individually*, based upon all the evidence that has been presented to you during this phase and at any of the prior phases of the trial.

(Emphasis added.)  The jurors were also given the following instruction:

> You must make your decision about whether mitigation is sufficiently substantial to call for leniency based solely upon your weighing of any mitigation proven to you and the aggravating factor you have already found during the Aggravation Phase. To do this, *you must individually determine the nature and extent of mitigating circumstances*.  Then, in light of the aggravating circumstance that has been proven to exist, you must individually determine if the totality of the mitigating circumstances is sufficiently substantial to call for leniency and a life sentence.

(Emphasis added.)

court's instruction, considered in light of the other instructions, adequately informed the jury and does not require reversal.

   4.   Jury coercion

¶53   Andriano argues that the trial court coerced the jury's death verdict in two ways when it gave an impasse instruction:  (1) by giving the instruction before ascertaining whether the jury was truly deadlocked; and (2) by improperly instructing the jury about its duty to deliberate.  "In determining whether a trial court has coerced the jury's verdict, this court views the actions of the judge and the comments made to the jury based on the totality of the circumstances and attempts to determine if the independent judgment of the jury was displaced."  *State v. Huerstel*, 206

---

Moreover, at the outset of the penalty phase, the jury was preliminarily advised that "[t]he jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist.  Each juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty." The jury was further instructed at that time to "individually decide whether there is mitigation and whether it is sufficiently substantial to call for the imposition of a life sentence rather than a sentence of death."

Defense counsel's closing argument in the penalty phase also correctly advised the jurors regarding their responsibilities.  Defense counsel told the jury, "[t]o clarify once again, individually determine the nature and extent of the mitigating circumstances.  Not as a group, individually.  What is it to me, as one juror.  What is my moral position on that circumstance."

Ariz. 93, 97, ¶ 5, 75 P.3d 698, 702 (2003).

¶54    Near the end of the second day of penalty phase deliberations, the jury submitted the following question to the trial court:  "If we are unable to reach an unanimous verdict, what is the procedure that will be followed?"  The court instructed the jury as follows:

> It appears from your note that you are at a deadlock in your deliberations.  I have some suggestions to help your deliberations, not to force you to reach a verdict.  I am merely trying to be responsi[ve] to your apparent need for help.  I do not wish or intend to force a verdict.  Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.  No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of reaching a verdict.
>
> However, you may want to identify areas of agreement and disagreement and discuss the law and the evidence as they relate to the areas of disagreement.
>
> If you still disagree, you may wish to tell the attorneys and me which issues, questions, law, or facts you would like us to assist you with.  If you decide to follow this suggestion, please write down the issues, questions, law or facts on which we can possibly help.  Please give your note to the bailiff. We will then discuss your note and try to help.[7]

The jury asked no further questions and returned a death verdict two days later.

---

[7]    This instruction contains language very similar to that set forth in the comment to the 1995 amendment to Arizona Rule of Criminal Procedure 22.4.

- 26 -

### a.    *Prematurely given instruction*

**¶55**      Rule 22.4 of the Arizona Rules of Criminal Procedure permits the trial court, upon being advised by the jury that it has reached an impasse in its deliberations, to inquire how it can assist the jury in its deliberations.  "Although the rule gives a trial judge broad discretion in dealing with juries at an impasse, the rule requires an affirmative indication from the jury it is in need of help before assistance may be offered." *Huerstel*, 206 Ariz. at 99, ¶ 17, 75 P.3d at 704.  In *Huerstel*, the trial court sent an impasse instruction to the guilt phase jury after three days of deliberations although it had received no note or other indication that the jury had reached an impasse.  *Id.* at 97-98, ¶¶ 6-8, 75 P.3d at 702-03.  The only questions the court had received related to the credentials of an expert witness, evidentiary matters, and a jury instruction. *Id.*  We held that the impasse instruction was prematurely given because it was given "without any clear evidence the jury needed help."  *Id.* at 99, ¶ 17, 75 P.3d at 704.

**¶56**      In this case, unlike the situation in *Huerstel*, the jury's question inquiring what would happen if the jury could not reach a verdict affirmatively indicated that the jurors were at an impasse.  The *Huerstel* rule does not require that the jury unequivocally state that it cannot reach a verdict, only that it give an "affirmative indication" that it is deadlocked.  The

trial court did not err in giving the impasse instruction.

b.    *Duty to deliberate instruction*

¶57      Andriano also argues that the impasse instruction given by the trial court inaccurately stated the law regarding a capital jury's duty in penalty phase deliberations. The crux of the argument is that, although the trial court's instruction would have been proper in the guilt phase or the aggravation phase of the proceedings, it was not appropriate in the penalty phase because jurors have no duty to "deliberate with a view to reaching an agreement" in the penalty phase.

¶58      In *Lowenfield v. Phelps*, the United States Supreme Court addressed whether an impasse instruction given to a capital sentencing jury coerced the death sentence in that case. 484 U.S. 231, 233 (1988).[8] The Supreme Court held that the

---

[8]    In *Lowenfield*, the trial court gave an instruction that said in part,

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.

> Each of you must decide the case for yourself but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of

instruction did not coerce the jury's death verdict. *Id.* at 241. The Court quoted with approval another capital case in which it had opined that jurors must try to reach a verdict:

> The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Id.* at 237 (quoting *Allen v. United States*, 164 U.S. 492, 501-02 (1896)). The Court emphasized that "[t]he continuing validity of this Court's observations in *Allen* are beyond dispute." *Id.*

¶59 *Lowenfield* thus makes clear that jurors in capital cases have a duty to deliberate in sentencing proceedings. Arizona's death penalty sentencing scheme does not alter this duty. While jurors individually determine whether a mitigating circumstance exists, A.R.S. § 13-703(C), the jury must still be unanimous in its decision to impose a death sentence or a life sentence, *id.* § 13-703.01(H). Therefore, the jurors may be instructed that they have a duty to deliberate in the penalty

---

your fellow jurors or for the mere purpose of returning a verdict.

484 U.S. at 235.

- 29 -

phase of a capital case.

¶60     In sum, because the impasse instruction correctly stated the law and was given after an affirmative indication from the jury that it was deadlocked, it cannot be said that the verdict was coerced.

**D.   Constitutionality of Lethal Injection Statute**

¶61     Arizona Revised Statutes § 13-704(A) (2001) provides that "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections."  Andriano contends that this statute is unconstitutionally vague because it does not prescribe the type or dosage of drugs that must be administered, the order in which they must be administered, or the qualifications of the personnel who administer them, thereby failing to ensure that death by lethal injection is not cruel and unusual.  She argues that to comport with the Eighth Amendment, "[t]he statute must [also] address the inherent difficulties with individual issues . . . such as vein accessibility and chemical resistances."

¶62     Section 13-704(A) constitutionally prescribes that the method of death shall be lethal injection.  *See State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995) (considering and rejecting argument that death by lethal

injection constitutes cruel and unusual punishment). *Hinchey*'s pronouncement that lethal injection as a method of execution comports with the Eighth Amendment was not conditioned upon the use of particular procedures in implementing lethal injection. Moreover, the United States Supreme Court has never held that death by lethal injection is cruel and unusual absent specific procedures for implementation, nor does Andriano cite any cases to that effect. Andriano has thus failed to establish an Eighth Amendment right to a particular protocol for lethal injection.[9]

**E. Independent Review**

¶63 Because Andriano's offense occurred before August 1, 2002, we independently review the aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13-703.04(A) (Supp. 2006); *see* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7. In conducting our independent review, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Roque*, 213 Ariz. 193, 230, ¶ 166, 141 P.3d 368, 405 (2006) (quoting *State v. Greene*, 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

---

[9] Andriano may raise in a petition filed pursuant to Arizona Rule of Criminal Procedure 32 any objections to the protocol to be used.

## 1. Aggravation

**¶64**     The jury found one aggravating factor – that Andriano committed the murder in an especially cruel manner.  A.R.S. § 13-703(F)(6).     Andriano argues that we should find the evidence insufficient to support the "especially cruel" finding by the jury because (1) Joe experienced only "distress," but not "extreme" physical pain or mental anguish after ingesting the sodium azide; (2) the defensive wounds were "minor and . . . not indicative of a great or prolonged struggle," showing that Joe was rendered unconscious "very quickly" after the bar stool attack began;  and  (3)  Joe's  distress  was  not  reasonably foreseeable.  We review the jury's finding de novo.  *Anderson II*, 210 Ariz. at 354, ¶ 119, 111 P.3d at 396 (citing A.R.S. § 13-703.04 (independent review)).

**¶65**     The  cruelty  prong  of  the  (F)(6)  aggravating circumstance may be proved by showing that the defendant knew or should  have  known  that  the  manner  in  which  the  crime  was committed  would  cause  the  victim  to  consciously  experience either physical pain or mental anguish before death.  *Trostle*, 191 Ariz. at 18, 951 P.2d at 883.   The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time."   During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing.   After pretending to call 911,

Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris, undoubtedly "experienced significant uncertainty as to [his] ultimate fate." *See Ellison*, 213 Ariz. at 142, ¶ 120, 140 P.3d at 925 (quoting *State v. Van Adams*, 194 Ariz. 408, 421, ¶ 44, 984 P.2d 16, 29 (1999)) (mental anguish, and hence cruelty, established upon this showing).

¶66    Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish.[10]

¶67    Andriano asks us to require that the physical or

---

[10]    The evidence established that Joe was likely unconscious when his throat was slashed. We therefore do not consider whether the stabbing caused physical pain or mental anguish.

mental pain experienced by the victim be "extreme." There is no such requirement for a cruelty finding. *See Trostle*, 191 Ariz. at 18, 951 P.2d at 883. Nonetheless, the physical pain and mental anguish Joe experienced likely were "extreme" by any standards.

¶68     Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being poisoned, mental anguish cannot be proved. While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish. And on the facts of this case, mental anguish is established even if Joe did not know he had been poisoned. Moreover, cruelty can be established upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that cruelty was established based on either – or both – mental anguish or physical pain.

  2.   Mitigation[11]

¶69     Andriano presented several mitigating circumstances

---

[11]   Andriano did not argue why the Court should find in its independent review that the mitigating circumstances were "sufficiently substantial to call for leniency." A.R.S. § 13-703(E). Counsel in capital cases "should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10.11(L) (2003).

for the jury's consideration, including the stress of Joe's cancer, her good grades in school, missionary and community work, and strong religious convictions. In addition, she presented evidence that she was a sexual abuse and domestic violence victim, a good mother to two children, married for six years, and a good inmate.

¶70    Although Andriano presented some evidence that she was a domestic violence victim, we assign little weight to this mitigating circumstance, in part because it is not related to the murder. *See Roque*, 213 Ariz. at 231, ¶ 169, 141 P.3d at 406 ("[T]he relationship between mitigating evidence and the murder may affect the weight given to the mitigating evidence.") (citation omitted); *State v. Newell*, 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833, 849, *cert. denied*, 127 S. Ct. 663 (2006). The evidence established that Andriano did not kill Joe while defending against a domestic violence attack. Instead, she poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat. Joe posed no threat to Andriano at the time of the attack because he was so weak from the poison and chemotherapy that he could not get up.

¶71    Andriano was under substantial stress from having to deal with Joe's terminal cancer. The record does not indicate, however, that at the time of the offense, the stress was any greater than it had been two years earlier when she and Joe

- 35 -

first learned he was terminally ill, and she was pregnant with their second child. Moreover, this is not a case in which Andriano suddenly "cracked" under extreme stress. Andriano methodically premeditated Joe's murder, showing that her stress bore little relation to Joe's death. This mitigating circumstance thus does not warrant substantial weight.

¶72 Andriano also offered evidence that she "may have been" sexually abused by her biological father when she was around the age of two, although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good grades in school and participated in missionary and community work. We do not weigh these mitigating circumstances heavily because the events are remote in time to the offense and thus their relevance is minimal. *Cf. Ellison*, 213 Ariz. at 144, ¶ 136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three").

¶73 The record contains conflicting evidence on whether Andriano was a good mother. In any event, we afford this mitigating circumstance minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment. Moreover, neither the fact of

Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.

¶74 Andriano was a good inmate in jail and helpful to staff and inmates from September 2003 until the penalty phase of her trial in December 2004. Because inmates are expected to behave, however, we assign this mitigating circumstance little weight. *State v. Harrod*, 200 Ariz. 309, 319, ¶ 53, 26 P.3d 492, 502 (2001), *vacated on other grounds*, 536 U.S. 953 (2002).

¶75 Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions. We thus assign this evidence minimal value.

¶76 Andriano also alleged as mitigating circumstances cooperation with law enforcement authorities, remorse, and age. The evidence presented, however, contradicts Andriano's assertion that she cooperated in the investigation of Joe's murder.[12] Moreover, because Andriano continues to deny

---

[12] Andriano did not mention the sodium azide when she was questioned by police and later asked her coworker to hide evidence. Evidence was also presented that Andriano staged the scene of the murder to make it appear as though she acted in self-defense.

responsibility for her conduct, we reject her contention that she is remorseful.  *See State v. Gulbrandson*, 184 Ariz. 46, 70-71, 906 P.2d 579, 603-04 (1995) (noting that defendant continued to deny responsibility in finding that he had not proven remorse as a mitigating circumstance).  We likewise do not find her age - thirty at the time of the offense - to be mitigating, particularly in light of her above-average I.Q.

¶77     We likewise give minimal weight to the remaining mitigating circumstances urged:  lack of prior convictions, good candidate for rehabilitation, no future threat to the community, and impact on family and friends.

### 3.    Propriety of the death sentence

¶78     The quality and strength of Andriano's mitigation evidence is not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband.  We therefore affirm Andriano's sentence of death.

### III.  CONCLUSION

¶79     For the foregoing reasons, we affirm Andriano's conviction and death sentence.

_____
Rebecca White Berch, Vice Chief Justice

- 38 -

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice

**APPENDIX**

**Claims Raised to Avoid Preclusion**

Andriano raises the following thirteen challenges to the constitutionality of Arizona's death penalty scheme to avoid preclusion:

1.  The death penalty is cruel and unusual punishment under any circumstances. This argument was rejected by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 187 (1976), and by this Court in *Harrod*, 200 Ariz. at 320, ¶ 59, 26 P.3d at 503.

2.  The death penalty is imposed arbitrarily and irrationally in Arizona. We rejected this argument in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

3.  Application of the death penalty on the facts of this case would constitute cruel and unusual punishment. No argument or authority is presented to support this claim.

4.  The prosecutor's discretion to seek the death penalty is not channeled by standards. We rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954 (2002).

5.  The aggravating factors set forth in A.R.S. § 13-703(F) are elements of capital murder and must be alleged in an indictment and screened for probable cause. We rejected this argument in *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 270, ¶ 9, 100 P.3d 18, 20 (2004).

6.  Application of the death penalty statutes promulgated after *Ring II*, 536 U.S. at 584, violates the prohibition against ex post facto laws. The changes altered the rules of evidence to permit different testimony than that permitted at the time of Andriano's offense. We rejected this argument in *State v. Ring* (*Ring III*), 204 Ariz. 534, 547, ¶ 24, 65 P.3d 915, 928 (2003).

7. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment. We rejected this argument in *Gulbrandson*, 184 Ariz. at 73, 906 P.2d at 606.

8. Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. We rejected this argument in *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

9. Arizona Revised Statutes § 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances. We rejected this argument in *State v. Pandeli*, 200 Ariz. 365, 382, ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, 536 U.S. 953 (2002).

10. Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. We rejected this argument in *State v. Poyson*, 198 Ariz. 70, 83, ¶ 59, 7 P.3d 79, 92 (2000).

11. Arizona Revised Statutes § 13-703 does not sufficiently channel the sentencer's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder. We rejected this argument in *Pandeli*, 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

12. Execution by lethal injection is cruel and unusual punishment. We rejected this argument in *Hinchey*, 181 Ariz. at 315, 890 P.2d at 610.

13. Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance exists and there is no mitigation sufficiently substantial to call for leniency. We rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).