212 P.3d 810

**Thomas HUDGINS, individually; Leroy Devore, individually, Plaintiffs/Appellees,**

**v.**

**SOUTHWEST AIRLINES, CO., a Texas corporation, Defendant/Appellant.**

**No. 1 CA–CV 07–0366.**

Court of Appeals of Arizona, Division 1, Department C.

Jan. 13, 2009.

Hebert Schenk, PC By Richard M. Gerry, The Gillespie Law Firm PC By Craig C. Gillespie, Phoenix, Attorneys for Plaintiffs/Appellees.

Munger Chadwick, PLC By Michael J. Meehan, Tucson, Attorneys for Plaintiff/Appellee Devore.

Fennemore Craig, PC By Timothy Berg, Alexander Arpad, Phoenix, Wheeler Trigg Kennedy, LLP By Malcolm Wheeler, Denver, CO, Attorneys for Defendant/Appellant.

## OPINION

TIMMER, Presiding Judge.

¶ 1 Southwest Airlines Co. ("SWA") appeals the judgment entered after a jury found SWA liable for compensatory and punitive damages stemming from its conduct surrounding the arrest and criminal prosecution of its passengers, appellees Thomas Hudgins and Leroy Devore. SWA argues the trial court erred by making evidentiary and instructional errors and by failing to either negate or reduce the punitive damages award. For the following reasons, we reject most of SWA's challenges but reverse the judgment insofar as it awards unconstitutionally excessive punitive damages and remand for entry of a reduced award.

## BACKGROUND

¶ 2 We review the facts and inferences in the light most favorable to upholding the jury's verdict. *Powers v. Taser Int'l, Inc.,* 217 Ariz. 398, 399, ¶ 4 n. 1, 174 P.3d 777, 778 n. 1 (App.2007).

¶ 3 Hudgins and Devore (collectively, "Plaintiffs") are Virginia-based bail enforcement agents, sometimes referred to as "bounty hunters," who operate through their business, H & D Enterprises. On Saturday, September 11, 1999, Plaintiffs flew from Baltimore to Phoenix on a SWA flight in order to apprehend a fugitive in Arizona. Before making the trip, Plaintiffs called SWA to obtain instructions on how to lawfully transport handguns on the airplane. SWA told both men to arrive two hours early, bring photo identification, and have departmental letters setting forth their itinerary and explaining their purpose for transporting weapons.

¶ 4 After arriving at the airport on the day of their flight, Plaintiffs presented cards at the SWA ticket counter identifying themselves as bail enforcement agents with H & D Enterprises and provided the requested information, including a letter from H & D Enterprises, which Devore had signed. Plaintiffs never represented themselves as law enforcement officers. A SWA agent provided forms entitled, "Notice to Armed Individuals" (the "NAI forms" or "forms"), which informed Plaintiffs that the Federal Aviation Administration ("FAA") prohibited any person from carrying a deadly or dangerous weapon on flights "unless they have a legal authority to do so," and described SWA flight procedures and restrictions. Plaintiffs signed the forms representing their agreement to abide by SWA's procedures and affirming they met "all F.A.A. regulations relating to armed passenger travel." In a space provided to list the individual's "[l]aw enforcement or authorizing [a]gency," Hudgins wrote "H & D Enforcement Agent," and Devore wrote "H & D Enterprises." Both provided identification numbers in spaces reserved for that information.

¶ 5 SWA personnel did not ask any questions of Plaintiffs and failed to realize they were not law enforcement agents. Plaintiffs asked to check their weapons because they did not have a fugitive in custody, but a SWA employee told them to take the weapons on board, and another employee, Susan Williams, signed the NAI forms as written authorization to do so. As a result, Plaintiffs

were allowed to board the SWA flight with their guns.

¶ 6 Before the airplane departed, the lead flight attendant took Plaintiffs' NAI forms and provided them to the captain, David Wilder. After the attendant pointed out the arguably unclear agency names written on the forms, the captain spoke with a Baltimore terminal agent and was told Plaintiffs worked for HUD—Housing and Urban Development. Near the end of the flight, DeVore informed another flight attendant that he was a bounty hunter. She informed the lead flight attendant who, in turn, informed Captain Wilder that Plaintiffs did not work for HUD. The captain then reviewed the NAI forms again and concluded Plaintiffs were not authorized under the FAA regulations to fly with firearms. At that point, he was unsure of their intentions and had safety concerns. Because Plaintiffs were not deemed an immediate threat, however, Captain Wilder continued the flight to Phoenix rather than divert to another city's airport. He did not call SWA personnel in Baltimore to determine why they had authorized Plaintiffs to fly with guns. When he called the Phoenix ground operations for a gate assignment, he followed what he believed to be applicable SWA flight operation manual procedures by requesting that law enforcement meet the airplane at the gate for assistance. Neither Captain Wilder nor any other SWA employee asked law enforcement agents to arrest Plaintiffs.

¶ 7 After the SWA flight landed, Phoenix Police officers met the airplane. Captain Wilder provided the police officers with the NAI forms and told them that SWA had permitted Plaintiffs to board the airplane. When Plaintiffs exited the aircraft, a police officer questioned them, and after he learned they were not law enforcement officers, he handcuffed them and escorted them to the airport's police holding area. The officer interviewed Plaintiffs and ultimately held them for approximately two hours. Phoenix Police called the Federal Bureau of Investigation ("FBI"), which sent an agent to the airport to question Plaintiffs. After the agent questioned Plaintiffs and received the NAI forms, he arrested Plaintiffs and had them transported to the Maricopa County Jail, where they remained until released from custody on Monday morning. Understandably, Plaintiffs suffered emotional distress from these events. Aside from the humiliation of their arrest, at the jail they were subjected to strip searches, crowded and unpleasant living conditions, and threats of violence from other inmates.

¶ 8 On September 13, the United States charged Plaintiffs with carrying concealed dangerous weapons on an aircraft in violation of 49 United States Code ("U.S.C.") section 46505(b)(1) (2001).[1] Additionally, the FAA sent letters to Plaintiffs on September 16 and September 28, respectively, informing them of the FAA's investigation of the matter and its possible imposition of civil penalties. After conducting a further investigation of the incident, on February 28, 2000, the United States dismissed the charges against Plaintiffs without prejudice to reinstating them. Similarly, the FAA informed Plaintiffs by

---

1. Section 46505 provides in relevant part as follows:

(b) General criminal penalty.—An individual shall be fined under title 18, imprisoned for not more than 10 years, or both, if the individual—

(1) when on, or attempting to get on, an aircraft in, or intended for operation in, air transportation or intrastate air transportation, has on or about the individual or the property of the individual a concealed dangerous weapon that is or would be accessible to the individual in flight[.]

. . . .

(d) Nonapplication.—Subsection (b)(1) of this section does not apply to—

(1) a law enforcement officer of a State or political subdivision of a State, or an officer or employee of the United States Government, authorized to carry arms in an official capacity;

(2) another individual the Administrator of the Federal Aviation Administration or the Under Secretary of Transportation for Security by regulation authorizes to carry a dangerous weapon in air transportation or intrastate air transportation; or

(3) an individual transporting a weapon (except a loaded firearm) in baggage not accessible to a passenger in flight if the air carrier was informed of the presence of the weapon.

We cite the current version of 49 U.S.C. § 46505 because no revisions material to this decision have occurred since September 1999.

letters dated March 28, 2000 that although they had violated Federal Aviation Regulations by flying with guns, because "it appear[ed] every attempt was made to comply with instructions given to [them] by the airline," the FAA would take no further action in the matter.

¶ 9 Plaintiffs subsequently initiated this lawsuit by filing a complaint alleging multiple claims against SWA for its acts and omissions on September 11, 1999 and during the subsequent federal investigations. The trial court later entered summary judgment for SWA on all claims. After Plaintiffs appealed, this court affirmed the trial court's disposition on most of Plaintiffs' claims but reversed the entry of summary judgment on Plaintiffs' cause of action based on negligence. *Hudgins v. Southwest Airlines, Co.,* 1 CA–CV 04–0487, mem. dec. at ¶ 1 (Ariz. App. Aug. 30, 2005) (*"Hudgins I"*). Additionally, the court reversed the trial court's ruling that as a matter of law Plaintiffs were not entitled to punitive damages. *Id.* On remand, the matter was tried to a jury, which found SWA liable to Plaintiffs for $500,000 each in compensatory damages and $4 million each in punitive damages. After addressing post-trial motions, the trial court entered final judgment and SWA's timely appeal followed.

## DISCUSSION

### I. Motion for new trial

¶ 10 SWA argues the trial court erred in denying its motion for new trial because the court made erroneous evidentiary rulings and improperly instructed the jury. We will not disturb the court's evidentiary rulings and grant a new trial absent an abuse of discretion and resulting prejudice. *Gemstar Ltd. v. Ernst & Young,* 185 Ariz. 493, 506, 917 P.2d 222, 235 (1996). Additionally, we review the entirety of the jury instructions to determine whether the court properly guided the jury in its deliberations. *State Farm Fire & Cas. Ins. Co. v. Grabowski,* 214 Ariz. 188, 192, ¶ 13, 150 P.3d 275, 279 (App.2007). We will reverse and grant a new trial on the basis of an erroneous instruction "only if it was both harmful to the complaining party and directly contrary to the rule of

law," and we have substantial doubt that the jury was properly guided in its deliberations. *Id.* With these principles in mind, we address Plaintiffs' challenges in turn.

### A. The FAA letter

¶ 11 Before trial, SWA moved the court in limine to preclude Plaintiffs from introducing in evidence a May 10, 1999 letter from the FAA to SWA's in-house attorney, Donald Hood, concerning a 1998 incident in which other bounty hunters were permitted to board a SWA flight with weapons. The letter stated that although the bounty hunters had presented false information, SWA personnel had failed to ask basic questions of them that would have prevented the deception. Significantly, the letter further provided as follows:

> Unfortunately this appears to be a prevelant [sic] problem in Arizona where, at least some individuals calling themselves Bail Recovery Agents or Bounty Hunters have been able to present themselves as being authorized to travel armed when indeed, they are not.

The letter closed by warning SWA to review its procedures to prevent future violations, which could result in the assessment of civil penalties. SWA asserted, among other things, the letter was unfairly prejudicial other-act evidence and therefore inadmissible pursuant to Arizona Rules of Evidence ("Rule") 403 and 404(b). The trial court ruled the letter was admissible to show that SWA had notice of the need to verify documents of passengers wishing to travel with weapons. It further concluded the probative value of the letter outweighed any undue prejudice to SWA.

¶ 12 SWA argues the trial court erred by admitting the FAA letter in evidence because its probative value was substantially outweighed by the danger of unfair prejudice. Specifically, SWA contends the letter's reference to Arizona's "prevalent problem" in allowing bounty hunters to fly with weapons invited the jury to use the letter as evidence of SWA's conduct on September 11, 1999. According to SWA, in the wake of the terrorist attacks of September 11, 2001, the letter

also incited the jury to punish SWA for its "prevalent problem" in allowing bounty hunters to fly armed on days other than September 11, 1999, which resulted in the award of substantial punitive damages.

¶ 13 The trial court may not admit evidence of other wrongful acts "to prove the character of a person in order to show action in conformity therewith." Rule 404(b). The court may, however, admit such evidence for other purposes, such as proof of an absence of mistake. *Id.* When evidence falls within a Rule 404(b) exception, however, the court must also decide whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or other considerations, thereby making the evidence inadmissible under Rule 403.[2] *State v. Ives*, 187 Ariz. 102, 111, 927 P.2d 762, 771 (1996). Because "probative value" and "the danger of unfair prejudice" are not easily quantifiable factors, we accord substantial discretion to the trial court in the Rule 403 weighing process. *State v. Gibson*, 202 Ariz. 321, 324, ¶ 17, 44 P.3d 1001, 1004 (2002).

¶ 14 The trial court did not abuse its discretion by admitting the FAA letter pursuant to a Rule 404(b) exception. The letter demonstrated that SWA had notice prior to September 11, 1999 that "bail recovery agents" were not authorized by the FAA to fly with weapons and that close inspection of identifying documents was necessary to prevent such occurrences. As SWA contends, the ability of bail enforcement agents to fly with weapons was not contested at trial. Regardless,

SWA's notice of this fact prior to September 11, 1999 remained at issue in light of its argument that it was not negligent in permitting Plaintiffs to board the airplane with guns because they identified themselves as "bail enforcement agents" rather than as "bounty hunters," which would have alerted SWA personnel that Plaintiffs were not authorized to fly armed.[3] Consequently, because the letter was not introduced to prove SWA acted in conformity with its actions in the 1998 incident but to show notice, the letter fell within a Rule 404(b) exception.

¶ 15 Additionally, the trial court did not err by rejecting SWA's Rule 403 argument that the probative value of the FAA letter was substantially outweighed by the danger of unfair prejudice. "Unfair prejudice" under Rule 403 " 'means an undue tendency to suggest decision on an horror.' " *State v. Schurz*, 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993) (citation omitted). We do not detect such bases from the record before us. First, the FAA letter did not say that SWA had a "prevalent problem" in allowing bounty hunters to fly with weapons but that the problem existed in Arizona. Indeed, the fact the FAA only issued a warning to SWA for a single incident suggested SWA did not have a prevalent problem. Thus, the letter did not have an undue tendency to incite the jury to punish SWA for repeated lapses in checking identification of those persons wishing to fly with weapons.

¶ 16 Second, at SWA's request, the trial court gave a limiting instruction to the jury regarding the FAA letter:

> Well, Southwest has been hammering on the fact that that's really all they used is bail enforcement agent. They never said, "bounty hunter." And when they did say "bounty hunter," the first thing that [lead flight attendant] Brian Talburt did was go report it to the captain, because he knew there was a problem.
>
> And when they try and explain that there is a different story about bounty hunter, bail enforcement agent, and what it all means, why does it say "bail enforcement agent" as your official identification? Why doesn't it say "bounty hunter"? Bounty hunter is someone who could walk into a post office and pick up one of those wanted posters and go out and try to apprehend that person.
>
> A bail enforcement agent is a person who works through a bondsman with the authorization of the court to apprehend a fugitive.

2. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

3. For example, during closing argument, SWA argued as follows:

> What's going on here is a lot of semantics, a lot of word games. All of their identification, their correspondence, how they introduce themselves, we are bail enforcement agents, they don't say bounty hunters, and the very first time they utter the phrase, all this changes, and everybody realizes that they're not authorized anymore.
>
> . . . .

Exhibit 29, a letter from the FAA to Southwest dated May 10, 1999, may not be used as evidence of Southwest Airlines Co.'s conduct on September 11, 1999. It may be used as evidence that Southwest Airlines Co. had notice that bounty hunters were not allowed to board flights with weapons. It may be used for impeachment of testimony or arguments.

Because we must presume the jury followed this instruction, *State v. McCurdy*, 216 Ariz. 567, 574, ¶ 17, 169 P.3d 931, 938 (App.2007), any danger the jury would use the letter as evidence of SWA's actions on September 11, 1999 or any other day was negligible.[4]

¶ 17 Third, Hood, SWA's attorney, testified he was unaware of the prevalent problem mentioned in the letter, explicitly dispelling any notion that SWA had experienced such problems.

¶ 18 For these reasons, the trial court did not err by admitting the FAA letter in evidence.

### B. Expert testimony

¶ 19 Plaintiffs moved the trial court in limine to preclude expert testimony from a police sergeant that, among other things, Plaintiffs had violated state laws before and after the SWA flight at issue by (1) failing to obtain a Maryland-issued concealed weapons permit in order to travel with concealed weapons through Maryland on the way to the Baltimore airport, and (2) failing to work with a local bail agent in apprehending the fugitive in Tucson after Plaintiffs' release from the Maricopa County Jail. Plaintiffs

argued that Rule 608(b) prohibited introduction of this testimony because it was not probative of Plaintiffs' truthfulness or untruthfulness. The trial court granted the motion, explaining only that the evidence concerning any possible violation of Maryland law was not relevant to any issue.

¶ 20 SWA argues the trial court erred in precluding the sergeant's testimony about the legality of Plaintiffs' pre- and post-flight actions because the events were probative of Plaintiffs' comparative fault for failing to adequately investigate how to legally transport weapons on an airplane. SWA additionally contends the evidence was admissible as intrinsic to the crimes eventually charged for boarding the SWA flight with weapons and to complete the story.[5] According to SWA, it was prejudiced by the error as "the evidence would have significantly affected the jury's view of comparative fault, Plaintiffs' credibility, and damages."

¶ 21 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. Whether Plaintiffs violated Maryland law by transporting concealed weapons without a permit while traveling to the Baltimore airport did not tend to make it more or less probable that Plaintiffs exercised reasonable care in investigating how to legally travel by air with weapons. Likewise, Plaintiffs' purported failure to comply with laws regarding apprehension of fugitives did not reflect on

---

**4.** SWA argues it was prejudiced because the trial court gave the instruction days after admission of the FAA letter. It also contends the instruction was "ambiguous, confusing, and particularly harmful given that much of the conduct Plaintiffs were complaining about did not occur on September 11, 1999" and because it permitted the jury to use the letter for reasons other than notice. Because SWA never raised these arguments to the trial court, it has waived them on appeal. *Orfaly v. Tucson Symphony Soc'y*, 209 Ariz. 260, 265, ¶ 15, 99 P.3d 1030, 1035 (App. 2004). Although the trial court rejected SWA's proposed instruction and drafted its own, we disagree with SWA that it was prevented from entering an objection because the court said, "I know you don't like it. That's how it's going in." It appears this comment was directed at Plaintiffs' counsel, not SWA's counsel. Regardless,

the court allowed both parties to voice opinions in crafting the instruction, and nothing stopped SWA from raising its objections, thereby preserving them for appeal.

**5.** SWA also contends that evidence of Plaintiffs' apprehension of the fugitive in Tucson after their release from jail demonstrates Plaintiffs were not so emotionally distressed that they could not do their jobs. SWA did not raise this argument to the trial court and therefore has waived it. *Orfaly*, 209 Ariz. at 265, ¶ 15, 99 P.3d at 1035. Regardless, we note the trial court's ruling did not preclude evidence of Plaintiffs' apprehension of the fugitive; the court only precluded opinion evidence regarding the legality of the apprehension.

the sufficiency of their investigation of how to legally fly with weapons. Moreover, we agree with Plaintiffs that any marginal relevance of this evidence would be to show that because Plaintiffs failed to comply with the law on other occasions, they failed to ensure their compliance with federal aviation regulations when flying from Baltimore to Phoenix—a use explicitly prohibited by Rule 404(b).

¶ 22 We also disagree with SWA that the precluded evidence constituted a "necessary preliminary" to the crimes charged for transporting weapons on the SWA flight and was therefore admissible as intrinsic evidence. SWA correctly states that other-act evidence is intrinsic to a charged offense and therefore admissible if, among other things, it constituted a "necessary preliminary" to that charge. *State v. Andriano,* 215 Ariz. 497, 502, ¶ 18, 161 P.3d 540, 545 (2007). The criminal charges in this case stemmed from Plaintiffs' acts in carrying weapons on the SWA flight without legal authority. Plaintiffs' purported violations of other laws before and after this event were not necessary preliminaries to the charged crimes because they did not facilitate Plaintiffs' act in illegally flying while armed. *Compare Andriano,* 215 Ariz. 497, 502, 503, ¶¶ 21–26, 161 P.3d 540, 545, 546 (2007) (holding wife's failed attempt to purchase life insurance policy on terminally ill husband's life and her extramarital affairs were not necessary preliminaries to her eventual murder of husband); *State v. Nordstrom,* 200 Ariz. 229, 248, ¶ 56, 25 P.3d 717, 736 (2001) (commenting that defendant's theft of gun used in murders and robberies in other case was example of acts that were necessary preliminaries to the crimes charged). Consequently, the precluded evidence was not intrinsic evidence.

¶ 23 Finally, we reject SWA's contention that the precluded evidence was admissible to complete the story of relevant events, thereby falling within an exception to Rule 404(b). *See State v. Johnson,* 116 Ariz. 399, 400, 569 P.2d 829, 830 (1977) (holding this exception to Rule 404(b) applies when the other acts are "so connected with the crime of which the defendant is accused that proof of one incident[a]lly involves the other or explains the circumstances of the crime."). The relevant events in this lawsuit concerned the manner in which Plaintiffs were able to fly with weapons, Plaintiffs' arrest, incarceration, eventual prosecution, and SWA's role in the post-arrest investigations. Plaintiffs' purported violations of other laws did not explain these events.

¶ 24 For these reasons, we decide the trial court did not err by precluding expert opinion evidence regarding the legality of Plaintiffs' pre- and post-flight actions.

## C. FBI reports

¶ 25 SWA moved the trial court in limine to preclude as inadmissible hearsay the admission of three FBI reports drafted by special agent R.S. The trial court denied the motion, ruling the reports were admissible pursuant to Rule 803(8), the public records exception to the hearsay rule. Thereafter, the parties stipulated to the admission of the reports at trial.

¶ 26 R.S. submitted each one-page, typewritten report addressed to "Phoenix" on a FBI form, which also reflected the case title and identification number and the name of the person who approved the report. In a report dated January 19, 2000, R.S. stated that on January 12, Assistant United States Attorney ("AUSA") Frederick A. Battista advised him that Plaintiffs had refused pre-trial diversion. Accordingly, Battista asked R.S. to "interview the SWA employee who checked the subjects in at Baltimore." R.S. concluded the report by recommending that the FBI reopen the case.

¶ 27 In a report dated March 15, R.S. stated he had contacted Paul Patton, a SWA security representative, and asked Patton to call the Baltimore customer service agent who had signed Plaintiffs' paperwork and ask her to contact R.S. Agent R.S. then wrote, in pertinent part, as follows:

.... Patton recontracted [sic] SA [R.S.] and advised that the employee was on vacation and was not available. Menages [sic] were left with the employees [sic] supervisors to have her call SA [R.S.].

Contact with AUSA Frederic [sic] Batista [sic], District of Arizona was made on 2/28/00. AUSA Batista [sic] was advised that no response had been received from the Southwest Airlines employee. AUSA Batista [sic] stated that he was going to dismiss the complaint.

On 3/14/00 SA [R.S.] attempted to contact AUSA Batista [sic] regarding the status of the case and the disposition of the evidence. AUSA Batista [sic] was not available, A [sic] message was left for him to contact SA [R.S.].

¶ 28 In a report dated April 26, R.S. related that on February 28 the district court dismissed the charges against Plaintiffs. Significantly, R.S. stated that "[t]he action was the result of the victim airline failing to respond to requests for interviews with the employees in Baltimore who dealt with subjects." R.S. concluded by recommending that the FBI close its case.

¶ 29 The public records exception to the hearsay rule provides, in relevant part, that public agency reports of "matters observed pursuant to duty imposed by law as to factual findings resulting from an investigation made pursuant to authority granted by law" are admissible "[u]nless the sources of information or other circumstances indicate lack of trustworthiness." Rule 803(8)(B) and (C).[6] The exception is justified by an assumption that public officials perform their duties properly and probably do not independently recall details reflected in records. Fed. R.Evid. 803(8), advisory committee note 8; *see also Shotwell v. Donahoe*, 207 Ariz. 287, 293, ¶ 19, 85 P.3d 1045, 1051 (2004) (stating Arizona's rule mirrors the federal rule). SWA argues the trial court erred in denying the motion in limine because (1) the public records exception does not apply to preliminary reports like the reports at issue, and (2) the March 15 report lacked trustworthiness.

¶ 30 To support its first contention, SWA relies on *Smith v. Isuzu Motors, Ltd.*, 137 F.3d 859, 862 (5th Cir.1998), which held that an agency's interim reports or preliminary memoranda did not fall within the public records exception as embodied by Federal Rule of Evidence 803(8)(C). *Smith* is distinguishable. The memoranda at issue in *Smith* did not contain factual findings or observations but set forth staff evaluative opinions that were ultimately rejected by the agency. *Id.* In contrast, R.S.'s reports contained factual accounts of his actions in investigating the case against Plaintiffs and a recommendation to close the case. The record does not reflect that the FBI later rejected these reports as inaccurate. Indeed, the reports bear the names of persons approving the reports, and the last report bears a handwritten notation adopting R.S.'s recommendation to close the case.

¶ 31 Also, although the trial court did not specify which part of Rule 803(8) applied to R.S.'s reports, they were properly admitted pursuant to subpart (B), which was not at issue in *Smith*. The reports reflected matters R.S. observed or heard and reported pursuant to his FBI duties. 1 Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 131 at 287–88 (3d ed.1991) (noting police reports are admissible pursuant to Rule 803(8)(B) in civil cases but not in criminal cases); *see also Baker v. Elcona Homes Corp.*, 588 F.2d 551, 556–59 (6th Cir.1978) (holding police report that stated facts observed at accident scene admissible in civil case under Rule 803(8)(B) and portion of report setting forth results of factual investigation admissible under Rule 803(8)(C)); *United States v. Van Hook*, 284 F.2d 489, 492–94 (7th Cir.1960) (admitting in evidence, as an exception to the hearsay rule, a letter written by a military captain pursuant to a federal statute, because the substance of the letter was not the captain's opinion but rather "an official document to prove [an] occur-

---

**6.** In its entirety, Rule 803(8) provides the following exception to the hearsay rule:

> Unless the sources of information or other circumstances indicate lack of trustworthiness, records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to

duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law.

rence"); *Moran v. Pittsburgh–Des Moines Steel Co.*, 183 F.2d 467, 472–73 (3rd Cir.1950) (holding that the district court erred in excluding a report from the Bureau of Mines of the United States Department of the Interior because the report was "prepared in obedience to ... statutory provisions" and the "report was a record of an 'occurrence' or 'event'"); *Petition for Naturalization of Grete W——*, 164 F.Supp. 659, 661 (E.D.Pa. 1958) (stating that "facts found in reports prepared by public officials in the course of their duty, in accordance with express statutory authority, are admissible as an exception to the hearsay rule ...[,]" and admitting in evidence a report written by an investigator of the Immigration and Naturalization Service and pursuant to a federal statute). For this additional reason, we are not persuaded by *Smith* to overturn the trial court's ruling.

¶ 32 SWA next argues the March 15 report lacked indicia of trustworthiness and was therefore inadmissible under Rule 803(8) because R.S. did not create that report until nearly seven weeks after his conversation with Patton, and he did not describe the basis for his apparent statement that multiple "messages" were left for the SWA customer service agent. We disagree. Although the report was apparently authored seven weeks after R.S. spoke with Patton, this span of time did not necessarily cast doubt on the trustworthiness of the report. R.S. did not report a detailed telephone conversation, the memory of which may have faded over seven weeks, but simply relayed Patton's statement that the customer service agent was on vacation and therefore unavailable for an interview. R.S. then wrote that messages were left for the agent's supervisors, which may have referred to messages left by Patton or messages left by R.S. Additionally, on a SWA form, Patton reported the call from R.S. on January 27 regarding the criminal case and listed Susan Williams as the customer service agent involved, thereby corroborating in part the accuracy of R.S.'s report. We cannot say the trial court abused its discretion by admitting the March

15 report even though it was authored seven weeks after the reported telephone conversation.

¶ 33 We additionally reject SWA's contention that R.S.'s failure to explain the basis for his statement that multiple messages were left for the customer service agent's supervisors rendered the report untrustworthy. We agree with the trial court that R.S.'s lack of full explanation, the misspellings in his report, its ambiguities, as well as the seven-week time delay in authoring the report, all went to the weight of the report rather than its admissibility. *See Baker*, 588 F.2d at 558–59 (stating plaintiffs' objections to police officer's report about traffic accident went more to weight than admissibility, which a jury must decide).

¶ 34 Finally, the March 15 report bore other indicia of trustworthiness, such as approval by another FBI employee and the lack of any indication that R.S. had a motive to report anything other than the truth of his investigative efforts. *See id.* at 558. For all these reasons, we hold the trial court did not err by admitting the FBI reports pursuant to Rule 803(8).[7]

**D. Concealment jury instruction**

¶ 35 The trial court instructed the jury in part as follows: "Efforts by a party to conceal evidence are relevant for consideration by the trier of fact in evaluating an award of punitive damages." *See Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 497, 733 P.2d 1073, 1080 (1987) (holding whether party concealed evidence was pertinent to jury's assessment of the reprehensibility of party's conduct for purposes of punitive damages award); *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 133, 907 P.2d 506, 519 (App.1995) (noting attorney's act in concealing information from client pertinent to punitive damage inquiry). SWA argues the court erred by giving this instruction because the evidence did not support a finding that SWA concealed evidence. Also,

---

7. SWA does not challenge the admissibility of any statements from third parties set forth in the FBI reports as inadmissible hearsay. We therefore do not address this issue. Likewise, in light of our holding, we do not address the admissibility of the reports pursuant to any other exception to the hearsay rule.

SWA contends the instruction was highly prejudicial, and a new trial on punitive damages is therefore warranted. *See Grabowski,* 214 Ariz. at 192, ¶ 13, 150 P.3d at 279.

¶ 36 The trial court was required to instruct the jury on all legal theories supported by evidence. *Gemstar Ltd.,* 185 Ariz. at 503, 917 P.2d at 232. Our review of the record reveals sufficient evidence to support the concealment instruction. Immediately after September 11, SWA conducted an internal investigation and concluded its personnel had failed to appropriately check Plaintiffs' credentials before allowing them to board the airplane with weapons. Despite this knowledge, SWA's in-house attorney, Donald Hood, refused a request from Craig Gillespie, Plaintiffs' criminal defense attorney, to disclose SWA's findings for Plaintiffs' use in defending against the federal charges and responding to a FAA investigative inquiry unless Plaintiffs signed a release of claims exonerating SWA from civil liability. Additionally, although FBI agent R.S. asked to interview customer service agent Williams, and SWA security officer Patton testified he left a message to this effect for Williams' supervisor, Williams did not recall receiving the message and never returned the call. The above-described evidence permitted the jury to conclude that SWA concealed evidence surrounding the events of September 11 pending its request for a release of claims from Plaintiffs. The trial court did not err by instructing the jury on concealment of evidence.

## II. Punitive damages

### A. Denial of motions for JMOL and new trial

¶ 37 SWA argues the trial court erred by denying its motions for judgment as a matter of law ("JMOL") and a new trial on Plaintiffs' claim for punitive damages. The trial court erred by denying the motion for JMOL if the facts supporting the claim had

"so little probative value, given the quantum of evidence required, that reasonable people could not agree" that such damages were in order. *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). We review the trial court's ruling de novo and view the evidence and all reasonable inferences from the evidence in the light most favorable to Plaintiffs as the nonmoving parties. *Chilton v. Center for Biological Diversity, Inc.,* 214 Ariz. 47, 55, ¶ 26, 148 P.3d 91, 99 (App.2006). We review the court's denial of the motion for new trial for an abuse of discretion. *Golonka v. Gen. Motors Corp.,* 204 Ariz. 575, 580, ¶ 9, 65 P.3d 956, 961 (App.2003).

¶ 38 Punitive damages are appropriately awarded in tort cases to punish the wrongdoer and deter others from emulating the misconduct. *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). Such damages, however, are awarded only in the most egregious cases. *Id.* at 331, 723 P.2d at 680. Thus, a jury may award punitive damages only if clear and convincing evidence exists that the tortfeasor possessed an "evil mind" while engaging in aggravated and outrageous conduct. *Id.* at 331–32, 723 P.2d at 680–81. Additionally, this conduct must have proximately caused harm to the claimant to constitute a basis for punitive damages. *Saucedo ex rel. Sinaloa v. Salvation Army,* 200 Ariz. 179, 182–83, ¶ 13, 24 P.3d 1274, 1277–78 (App.2001).

¶ 39 SWA does not contest it acted with the requisite evil mind to warrant the imposition of punitive damages. Rather, it contends the court erred by denying the motions for JMOL and new trial because Plaintiffs failed to prove by clear and convincing evidence that SWA's post-September 11 acts, which formed the basis for the punitive damages claim, caused harm to Plaintiffs. Plaintiffs respond that SWA's acts before and after September 11 caused them harm and supported the punitive damages award.[8]

---

8. Plaintiffs briefly argue that because in *Hudgins I* this court found a genuine issue of material fact for a jury to resolve regarding causation, we must reject SWA's argument pursuant to the law of the case doctrine. We disagree. The law of the case doctrine does not apply if the issue was

not decided in the earlier appeal, as is the case here. *Employers Mut. Cas. Co. v. McKeon,* 170 Ariz. 75, 77, 821 P.2d 766, 768 (App.1991). This court found an issue of fact concerning the causation element of Plaintiffs' negligence claim; it did not address causation in the context of puni-

¶ 40 Before we can decide whether the conduct underlying the punitive damages award caused harm to Plaintiffs, we must identify the SWA conduct that qualified as aggravated, outrageous, and performed with an "evil mind." *Linthicum,* 150 Ariz. at 331–32, 723 P.2d at 680–81. A defendant acts with an evil mind if he "should be consciously aware of the evil of his actions, of the spitefulness of his motives or that his conduct is so outrageous, oppressive or intolerable in that it creates a substantial risk of tremendous harm to others." *Id.* at 330, 723 P.2d at 679 (citing *Rawlings v. Apodaca,* 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986)). Mere gross negligence or even reckless disregard of circumstances does not support an award of punitive damages. *Volz v. Coleman Co.,* 155 Ariz. 567, 570, 748 P.2d 1191, 1194 (1987). To determine whether sufficient evidence exists that a defendant acted with an evil mind, a court examines factors such as the reprehensibility of the conduct, the severity of harm that was actually or potentially imposed and the defendant's awareness of it, the duration of the misconduct, and any concealment of the risk of harm. *Thompson v. Better–Bilt Aluminum Prods. Co.,* 171 Ariz. 550, 556, 832 P.2d 203, 209 (1992). An evil mind can be established by a defendant's statements or inferred from its expressions, conduct, or objectives. *Id.* at 557, 832 P.2d at 210.

¶ 41 We reject Plaintiffs' contention that Captain Wilder's act in radioing a request for law enforcement assistance at the Phoenix gate upon landing in Phoenix evidenced an "evil mind" or constituted the type of aggravated or outrageous conduct that triggers punitive damages. Plaintiffs assert that Captain Wilder's evil mind was evidenced by his admission at trial that his radio call was misleading by failing to relate that SWA had authorized Plaintiffs to carry weapons on board and by his failure to correct the omission when the police arrived and arrested Plaintiffs. The record does not support this assertion. Captain Wilder testified that, to the best of his memory, he

radioed to ground personnel that he had two armed passengers who were not authorized to have weapons and requested that law enforcement meet the plane at the gate. When asked about the radio transmission on cross-examination, Wilder stated his request was "somewhat misleading in that they did have paperwork," and further said "the better terminology might have been who I didn't feel were qualified under FAA rules to have weapons." Wilder did not admit that he intentionally misled ground personnel as Plaintiffs imply and, indeed, he denied doing so. Additionally, Plaintiffs incorrectly state that Wilder did not correct the omission when the police arrived at the gate. Wilder provided the police with the NAI forms when he met them at the gate, related that SWA had permitted Plaintiffs to board with weapons, and further said that Plaintiffs had identified themselves as bail enforcement agents. Neither he nor any other SWA employee asked the police to arrest Plaintiffs. At most, Wilder was negligent in radioing for law enforcement assistance without explaining that SWA had permitted Plaintiffs to board with weapons. We do not discern any basis, let alone clear and convincing evidence, to conclude Wilder acted to intentionally injure Plaintiffs or consciously disregarded an unjustified risk of significant harm to them, particularly as he fully explained what he knew of the circumstances upon speaking with police at the gate. Thus, Wilder's actions could not have formed the basis for the punitive damages award.

¶ 42 We agree with the trial court that the jury primarily based the punitive damages award on the post-September 11 actions of SWA attorney Hood. As previously described, *see supra* ¶ 36, Hood refused to release the results of SWA's internal investigation unless Plaintiffs executed a release of claims against SWA. According to Gillespie, Plaintiffs' attorney, Hood acknowledged that Plaintiffs needed SWA's help to get the criminal cases dismissed. Regardless, referring to Plaintiffs, Hood said those "rednecks from Virginia" would not get any

tive damages. *Hudgins I* at ¶ 14. Also, although the court found an issue of fact regarding punitive damages, it only resolved whether "SWA's,

specifically its counsel's, conduct was the result of an evil mind." *Id.* at ¶ 32.

488

of SWA's money, and stated that because their convictions would be SWA's best defense to any lawsuit, he was willing to let the prosecutions go forward. Although Hood eventually changed his mind and asked the United States Attorney's Office to dismiss the charges against Plaintiffs because SWA had let them on the plane with the weapons and therefore SWA "may" have been at fault, he did not confirm the request in writing as requested by AUSA Stooks and did not transmit the results of SWA's internal investigation, which demonstrated that Plaintiffs had not misrepresented themselves to any SWA employee in order to board the airplane with weapons. Additionally, Hood never told Gillespie of his request to Stooks, effectively leading Gillespie and Plaintiffs to believe SWA had continued to withhold cooperation in the criminal investigation. Finally, as previously related, *see supra* ¶ 36, SWA later failed to respond to FBI agent R.S.'s request to interview customer service agent Williams.

¶ 43 Based on this evidence, the jury could have reasonably found that SWA acted outrageously and with an evil mind by consciously pursuing a course of conduct designed to threaten Plaintiffs with criminal convictions in order to secure a release of civil liability for SWA. Similarly, the jury could have reasonably concluded that SWA consciously disregarded a substantial risk of emotional harm to Plaintiffs stemming from the prospect of a prolonged criminal prosecution and possible convictions. *See Linthicum*, 150 Ariz. at 330, 723 P.2d at 679. Having identified the conduct underlying the punitive damages award, we now address whether these actions proximately caused Plaintiffs any harm as required to justify a punitive damages award. *See Saucedo*, 200 Ariz. at 182–83, ¶ 13, 24 P.3d at 1277–78.

¶ 44 In denying the renewed motion for JMOL and motion for new trial, the trial court reasoned that Hood "failed to disclose information that would have resulted in immediate dismissal of the criminal charges" against Plaintiffs. SWA does not contest that Plaintiffs suffered continuing emotional distress throughout the duration of the federal government's investigation. Rather, it ar-

gues the court erred in its ruling because no evidence permitted the jury to conclude the United States Attorney's Office would have immediately dismissed the charges upon receiving the results of SWA's internal investigation. SWA contends the court impermissibly allowed the jury to speculate that the charges would have been immediately dismissed with SWA's disclosure of events.

¶ 45 As SWA correctly notes, the trial court must not permit a jury to draw speculative inferences that are not grounded on probative facts. *Matts v. City of Phoenix*, 137 Ariz. 116, 119, 669 P.2d 94, 97 (App.1983). "Reversal is required when a jury's verdict 'is supported by nothing beyond speculation, suspicion and bottomless inference.'" *Acuna v. Kroack*, 212 Ariz. 104, 113, ¶ 34, 128 P.3d 221, 230 (App.2006) (quoting *In re Pitt's Estate*, 88 Ariz. 312, 318, 356 P.2d 408, 412 (1960)). We disagree, however, that the jury necessarily speculated to have found that SWA's failure to disclose the results of its internal investigation and respond to the FBI's request to interview Williams caused a delay in the dismissal of the criminal charges.

¶ 46 Gillespie testified that in a telephone conversation with Hood on November 16, 1999, Hood said he had spoken with the United States Attorney's Office and concluded Plaintiffs would need SWA's assistance in getting the case dismissed. Hood refused such assistance unless and until Plaintiffs released SWA from civil liability.

¶ 47 AUSA Battista, who was assigned to the criminal cases against Plaintiffs in late December 1999, testified that at the time he was assigned the case questions had arisen about how his office should proceed with the prosecution. According to Battista, under a legal doctrine known as entrapment by estoppel, he could not have successfully prosecuted Plaintiffs if they had fully disclosed the nature of their business on September 11 and SWA nevertheless authorized them to board the airplane with weapons. Although Battista had the SWA-signed NAI forms, he needed to know whether Plaintiffs had made any misstatements to Williams to secure those forms in order to decide the applicability of the entrapment by estoppel doctrine. He

learned Plaintiffs' side of the story when he met with their counsel in December 1999 but considered SWA's version of events "key" in deciding whether to dismiss the cases. This need prompted Battista on January 8, 2000 to ask FBI special agent R.S. to interview Williams. On February 24, because R.S. had failed to secure an interview and Battista was under a time constraint to either indict Plaintiffs through the grand jury process or dismiss the case,[9] Battista moved to dismiss the cases without prejudice to refiling the charges at a later date if the government learned different information about what had occurred on September 11.

¶ 48 The jury could have reasonably inferred from this evidence that if SWA had revealed the results of its internal investigation when completed in September 1999 or when requested two months later by Gillespie and/or proffered Williams for an interview when requested by R.S., Battista would have dismissed the case sooner rather than continuing to investigate the case.[10] Additionally, the jury could have concluded that had Battista learned of SWA's version of events, he would not have left open the possibility of future criminal charges by dismissing the cases without prejudice. Therefore, because the jury did not have to speculate to reach this conclusion, we reject SWA's argument that Plaintiffs failed to prove that SWA's post-arrest actions proximately caused Plaintiffs harm.

### B. Constitutionality of punitive damage awards

¶ 49 SWA next argues that even assuming the jury appropriately awarded punitive damages, the trial court erred by failing to substantially reduce the $4 million awards because they were excessive and therefore deprived SWA of due process under the United States Constitution. Plaintiffs take the opposite position.

■ ¶ 50 Punitive damage awards are not intended to compensate plaintiffs but exist to punish the wrongdoer and deter future harmful conduct. *Exxon Shipping Co. v. Baker*, —— U.S. ——, 128 S.Ct. 2605, 2621, 171 L.Ed.2d 570 (2008). Such awards, however, are not without constitutional restraints. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards."); *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 500–01, ¶ 93, 200 P.3d 977, 997–98 (App.2008). A grossly excessive punitive damage award violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the defendant did not have "fair notice" of its exposure to the extent of punishment that could be imposed. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also State Farm*, 538 U.S. at 417, 123 S.Ct. 1513 ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.") (citations omitted).

**9.** Battista explained that under the Federal Rules of Criminal Procedure, when the government files a criminal complaint against a person, the government generally has thirty days to seek an indictment by presenting evidence to a grand jury that probable cause exists that a crime occurred. In the criminal cases at issue, the government and Plaintiffs stipulated to continue that date but by February 24, 2000, the government either had to dismiss the cases or indict Plaintiffs.

**10.** SWA points out that because the FAA continued its investigation beyond the time taken by the United States Attorney's Office even though the FAA interviewed SWA employees within three weeks of the September 11 event, it is likely that SWA's purported lack of cooperation in the criminal cases had no impact on the timing of the dismissals. While the jury was free to reach this conclusion, it was equally free to reject it based on the above-quoted testimony. We also reject SWA's contention that the prosecutors' lack of awareness that SWA had failed to cooperate impacts the causation issue. The jury's conclusion that a quicker dismissal would have occurred had SWA supplied its internal investigation to authorities or made Williams available for an interview was not dependent on a finding that the prosecutors knew of SWA's actions or inaction.

¶ 51 The Court in *Gore* presented three guideposts for determining the constitutionality of a purportedly excessive punitive damage award: the degree of reprehensibility of the defendant's misconduct, the ratio between compensatory and punitive damages, and how the award compares with other penalties. 517 U.S. at 575, 116 S.Ct. 1589. We review the trial court's application of these guideposts to the jury's punitive damage awards de novo. *State Farm*, 538 U.S. at 418, 123 S.Ct. 1513

### 1. Reprehensibility

¶ 52 The degree of reprehensibility of a defendant's misconduct is the most important indication of the reasonableness of the punitive damage awards. *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. To assess where misconduct falls on the reprehensibility scale, we must consider whether:

The harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. No single element is conclusive. *Id.* ("The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."). Within the reprehensibility scale suggested by *Gore*, however, "acts of violence or threats of bodily harm ... [are] the most reprehensible, followed by acts taken in reckless disregard for others' health or safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence." *Florez v. Delbovo*, 939 F.Supp. 1341, 1348–49 (N.D.Ill.1996) (citing *Gore*, 517 U.S. at 575–76, 116 S.Ct. 1589); *see also Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir.2001).

¶ 53 The record before us reveals the existence of two reprehensibility factors. First, SWA acted in reckless disregard of Plaintiffs' health. Although Plaintiffs had already suffered emotional distress by being arrested and jailed for a weekend, their distress continued as long as the prospect of prison and/or a fine loomed with the ongoing investigation. By failing to disclose the results of its internal investigation to authorities and produce Williams for an FBI interview, SWA prolonged the investigation, which in turn prolonged Plaintiffs' emotional distress. Second, SWA acted with intentional malice rather than by accident. Specifically, in an attempt to avoid civil liability for SWA from an anticipated lawsuit initiated by Plaintiffs, Hood was willing to allow the criminal cases to proceed rather than provide the United States Attorney's Office with the results of SWA's internal investigation. *See Sec. Title*, 219 Ariz. at 502, ¶ 97, 200 P.3d at 999 ("The reprehensibility factor of harm suffered as 'the result of intentional malice, trickery, or deceit' rather than 'mere accident' may be satisfied when the defendant commits willful acts in derogation of the plaintiff's rights.").

¶ 54 We cannot ignore, however, that evidence exists that militates against a finding that SWA acted in a highly reprehensible manner. Although SWA, through Hood, refused to intercede with federal prosecutors on Plaintiffs' behalf without first receiving a release of claims, SWA had already provided authorities with the NAI forms at the time of Plaintiffs' arrest and told police that SWA had authorized them to board with weapons. Thus, at the time it refused Gillespie's request to disgorge the results of its internal investigation, SWA knew that federal authorities were aware that it had authorized Plaintiffs to board the airplane with weapons. Also, after Gillespie asked for SWA's assistance, Hood called AUSA Stooks and requested that the charges be dropped. Finally, as far as the record reflects, SWA's actions that formed the basis for punitive damages were isolated to this case.

¶ 55 Considering all pertinent factors, we conclude that SWA's misconduct falls within the low to middle range of the reprehensibility scale.

### 2. Ratio between compensatory and punitive damages

¶ 56 Under the second *Gore* guidepost, we consider whether the ratio of

the punitive damages award to the actual or potential harm inflicted on Plaintiffs is reasonable. *Gore,* 517 U.S. at 580–81, 116 S.Ct. 1589; *State Farm,* 538 U.S. at 418, 123 S.Ct. 1513. A determination of the constitutionally appropriate ratio is fact-intensive and specific to each case. *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513.

¶ 57 Although the Supreme Court has consistently rejected the concept of using a mathematical formula to crystallize the relationship between compensatory and punitive damages, it has held that while single-digit multipliers are more likely to comport with due process, a factor more than four comes "close to the line" of constitutional impropriety. *Gore,* 517 U.S. at 581–82, 116 S.Ct. 1589 (citation omitted). A high ratio is justified if a particularly egregious act results in a small amount of damages or such damages are difficult to compute. *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513. Conversely, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

¶ 58 The ratio of punitive damages to compensatory damages in this case is 8:1 (for each plaintiff, $4 million in punitive damages to $500,000 in compensatory damages). We agree with SWA that this high ratio is unwarranted. The compensatory damages are substantial; Plaintiffs each were awarded $500,000 for emotional distress stemming from events that lasted less than seven months. *See State Farm,* 538 U.S. at 426, 123 S.Ct. 1513 (deciding that $1 million compensatory damage award for two plaintiffs' emotional distress over the course of one and one-half years was substantial). Moreover, SWA's misconduct did not cause Plaintiffs physical·or economic injury, and the compensatory damage award likely contained a penal element that the jury duplicated in the punitive damages award. *Id.* (reasoning that lower ratio of punitive damages was in order as plaintiffs did not suffer physical or economic injury and compensatory damages for

emotional distress likely reflected a punitive element).

¶ 59 Plaintiffs argue that a high ratio is justified because SWA's misconduct could have resulted in their criminal convictions. In turn, Plaintiffs could have lost their freedom, their jobs, and even their lives or physical well-being if imprisoned. We disagree. At most, SWA's misconduct delayed the dismissal of the federal charges and did not bear on the legal viability of the criminal charges. For example, no evidence suggests SWA sought to fabricate events in order to secure criminal convictions. Thus, the jury could not have reasonably concluded that SWA's misconduct could have resulted in criminal convictions.

¶ 60 In sum, the 8:1 ratio of punitive damages to compensatory damages is unreasonable.

### 3. Comparative penalties

¶ 61 The final *Gore* guidepost directs us to consider any disparity between the punitive damage award and the "civil penalties authorized or imposed in comparable cases." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. We find this guidepost the least helpful in this case. No party contends a comparable civil penalty for SWA's misconduct exists. Rather, the parties, as did the trial court, cite the criminal fine available for imposition against an enterprise convicted of obstructing a criminal investigation in violation of Ariz.Rev.Stat. ("A.R.S.") section 13–2409. The presumptive fine for a conviction under this provision is $500,000 with a maximum fine of $1 million. A.R.S. § 13–803(A), (B) (2001).[11]

¶ 62 Although we can examine criminal penalties for guidance, they are largely unhelpful. *State Farm,* 538 U.S. at 428, 123 S.Ct. 1513. The existence of a criminal penalty certainly bears on the seriousness with which a State views the wrongful action; "[w]hen used to determine the dollar amount of the award, however, the criminal penalty has less utility." *Id.* This is mainly due to

11. We cite the current versions of Arizona's criminal statutes because no revisions material to this decision have occurred since 1999.

the greater protections afforded in criminal trials such as the heightened burden of proof. *Id.*

¶ 63 Reference to criminal fines for obstruction of a criminal investigation is particularly unhelpful in this case. An entity commits this offense if, in relevant part, it "knowingly attempt[ed] by means of bribery, misrepresentation, intimidation or force or threats of force to obstruct, delay or prevent the communication of information or testimony relating to a violation of any criminal statute to a ... prosecutor ...." A.R.S. § 13–2409 (Supp.2008). No evidence suggests SWA used any of the above-described means to delay the criminal investigations against Plaintiffs. Even assuming SWA employed such means, which would have made its misconduct more reprehensible, it is notable that the presumptive and maximum fines for the offense fall far below the $4 million awards imposed by the jury.

### 4. Application of *Gore* guideposts

¶ 64 Applying the *Gore* guideposts, we conclude the punitive damages award was unconstitutionally excessive and must be reduced. SWA's misconduct falls on the low to middle range of the reprehensibility scale, and the 8:1 ratio of punitive damages to compensatory damages is unreasonable. Although no comparable civil penalty exists, the closest criminal penalty is far less than the punitive damages imposed on SWA.

¶ 65 Setting the proper amount of punitive damages is challenging. *See Sec. Title,* 219 Ariz. at 504, ¶ 107, 200 P.3d at 1001. As this court concluded recently in *Security Title,* however, "we are guided by the Supreme Court's suggestion in *State Farm* that when the compensatory damages award is substantial, a punitive damages award equal to the compensatory award may 'reach the outermost limit of the due process guarantee.'" *Sec. Title,* 219 Ariz. at 504, ¶ 108, 200 P.3d at 1001 (citing *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513). We decide that a one-to-one ratio is appropriate to apply in this case. Although factors exist that arguably support imposition of a lesser ratio, *see supra* ¶¶ 54, 59, Plaintiffs persuade us that SWA's wealth warrants a more substantial punitive damages award in order to serve the deterrent purposes underlying such awards. *See Linthicum,* 150 Ariz. at 330, 723 P.2d at 679. We therefore reverse the judgment and remand to the trial court with instructions to reduce the punitive damages awards assessed against SWA to $500,000 for each plaintiff, for a total punitive damages award of $1 million.

### CONCLUSION

¶ 66 For the foregoing reasons, the trial court did not err by failing to grant SWA a new trial in whole or part. Further, the court properly denied SWA's motion for JMOL on the issue of Plaintiffs' entitlement to any punitive damages. The court erred, however, by failing to reduce the amount of the punitive damages award. After applying the *Gore* guideposts, we conclude that punitive damages should be reduced to $500,000 for each plaintiff, for a total punitive damages award of $1 million. Thus, we affirm in part, reverse in part, and remand to the trial court for entry of a judgment reflecting this reduction in the punitive damages award.

CONCURRING: PATRICIA K. NORRIS, and MICHAEL J. BROWN, Judges.