NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

ARGYLL VEGA SOTO,
*Plaintiff/Appellee,*

*v.*

TEN BRIDGES, LLC, et al.,
*Defendants/Appellants.*

No. 1 CA-CV 24-0759

FILED 07-24-2025

---

Appeal from the Superior Court in Maricopa County
No. CV2021-004184
The Honorable John L. Blanchard, Judge

**AFFIRMED**

---

COUNSEL

Law Offices of Kyle A. Kinney, PLLC, Scottsdale
By Kyle A. Kinney
*Counsel for Plaintiff/Appellee*

Zwillinger Wulkan PLC, Phoenix
By Scott H. Zwillinger, Peter A. Silverman, Jennifer L. Allen,
    Samantha T. Lee
*Co-Counsel for Defendants/Appellants*

Legal AZ, Tempe
By Morgan Seegmiller
*Co-Counsel for Defendants/Appellants*

---

## MEMORANDUM DECISION

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Kent E. Cattani and Judge Angela K. Paton joined.

---

**T H U M M A**, Judge:

¶1 Defendant Ten Bridges, LLC (Ten Bridges) appeals from a judgment entered after a jury verdict, challenging the admission of parol evidence, the sufficiency of the evidence supporting common law fraud and a punitive damages award in favor of plaintiff Argyll Vega Soto. Because Ten Bridges has shown no error, the judgment is affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2 Vega Soto owned real property in Maricopa County, Arizona. He fell behind on homeowners' association (HOA) payments, and in 2018, the HOA sought foreclosure against him. In December 2018, a default judgment entered against Vega Soto, and a judicial foreclosure was ordered. A sheriff's foreclosure sale took place in June 2019. The sheriff used the proceeds to pay the HOA lien and deposited $117,277.39 in excess proceeds with the court.

¶3 Ten Bridges buys distressed properties and the right to excess proceeds. Ten Bridges' employee Sharon Leckey left a voice mail message with Vega Soto in November 2019, offering Ten Bridges' services and mentioning options. Vega Soto did not return the call. Leckey then sent Vega Soto an email on December 27, 2019, stating there were "excess funds related to" the property he had owned and that Ten Bridges had expertise in recovering excess proceeds and had helped people all around the country to do so. Leckey's email stated the process to recover excess proceeds was "extensive," "exhausting" and "tedious." On behalf of Ten Bridges, Leckey's email offered Vega Soto two options:  either sell his rights to the excess proceeds for a lump sum he would receive upon signing the agreement or split with Ten Bridges the legal costs of filing an application for excess proceeds.

¶4            In the following three days, Vega Soto and Leckey exchanged emails and texts, and had telephone conversations, about the excess proceeds. Ultimately, Vega Soto agreed to sell Ten Bridges the right to pursue the $117,277.39 in excess proceeds in exchange for a cash payment of $10,000. Vega Soto alleges Leckey also promised that, if Ten Bridges successfully recovered the excess proceeds, it would pay him an additional $5,000.

¶5            The next afternoon, Leckey told Vega Soto to drive to a UPS store to meet a notary and sign a quit claim deed, giving up any interest Vega Soto had in the property. As Vega Soto was driving to UPS, Leckey read the agreement to him over the phone. Then, Leckey emailed Vega Soto a copy, which he signed less than 30 minutes later after "glanc[ing]" at it. Once Vega Soto sent proof he had signed the contract, Leckey deposited $10,000 in Vega Soto's account. Vega Soto texted Leckey a few days later, asking her to "remember the $5,000 left when [Ten Bridges] gets more money."

¶6            Ten Bridges applied for the excess proceeds and, in mid-2020, obtained an order distributing the $117,227.39. After the United States Department of Housing and Urban Development (HUD) received payment of a $30,479.59 lien it had on the property, Ten Bridges received $86,797.80. Ten Bridges did not, at that time, pay Vega Soto the $5,000 he claimed they agreed upon if Ten Bridges successfully recovered the excess proceeds.

¶7            In January 2021, Vega Soto called Leckey to ask for an update. Leckey responded that Ten Bridges had yet to recover the funds and blamed the delay on COVID. Vega Soto, however, knew Ten Bridges had recovered the excess proceeds about seven months earlier.

¶8            Vega Soto then filed this case against Ten Bridges, alleging common law fraud in the inducement and breach of contract.

¶9            A five-day trial followed, where Vega Soto, Leckey and Ten Bridges' owner and manager Demian Heald testified. Ten Bridges moved for judgment as a matter of law on the breach of contract claim, arguing that, when looking at the four corners of the contract, Ten Bridges had fulfilled the terms of the agreement. The court denied the motion and found that parol evidence of the verbal agreement for an additional $5,000, once Ten Bridges recovered the excess funds, was admissible as evidence of fraud in the inducement.

3

¶10        After deliberating, the jury returned a verdict in favor of Vega Soto on both counts. The jury awarded $5,926.05 in damages on the breach of contract claim along with a combined total of $500,000 in compensatory and punitive damages on the fraud claim.

¶11        Ten Bridges renewed its motion for judgment as a matter of law on the breach of contract claim and also moved for new trial, both of which were denied. Ten Bridges timely appealed. This court has appellate jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) Sections 12- 120.21(A)(1) and - 2101(A)(1) (2025).[1]

## DISCUSSION

¶12        Ten Bridges presents three arguments on appeal. First, Ten Bridges challenges the admission of testimony regarding a verbal agreement to pay an additional $5,000 if Ten Bridges successfully recovered the excess proceeds. Second, Ten Bridges argues Vega Soto presented insufficient evidence to support common law fraud. Third, Ten Bridges argues it was error to award punitive damages, and even if punitive damages were appropriate, the amount awarded was excessive and unconstitutional. The court addresses each argument in turn.

I.        **The Superior Court Did Not Err in Admitting Evidence of a Verbal Agreement for an Additional $5,000 if Ten Bridges Recovered the Excess Proceeds.**

¶13        This court reviews rulings on the admission of evidence for an abuse of discretion and will reverse if "unfair prejudice resulted" or "the court incorrectly applied the law." *Larsen v. Decker*, 196 Ariz. 239, 241 ¶ 6 (App. 2000) (citing cases).

¶14        The contract signed by Vega Soto states Vega Soto (referred to as Grantor) "for and in consideration of $10,000.00 (Ten-Thousand Dollars) received, conveys and quit claims to Ten Bridges LLC ('Grantee') . . . all of Grantor's rights, title, and interest in the following described real property." The contract has an integration clause, stating it "represents the entire and exclusive agreement between the Grantor and the Grantee. There are no other verbal agreements, terms, or conditions between the parties which are not expressly provided herein."

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

¶15 Ten Bridges argues it was error to admit evidence of a verbal agreement that Ten Bridges would pay Vega Soto an additional $5,000 if Ten Bridges successfully recovered the excess proceeds. It more specifically argues that, under the parol evidence rule, any evidence of a verbal agreement inconsistent with the written contract was inadmissible, and thus the superior court erred in allowing Vega Soto's testimony and submitting the breach of contract claim to the jury.

¶16 The parol evidence rule generally "precludes admission of any understandings or representations made prior to or contemporaneously with the written contract if the contract was intended as a final and complete integration of the parties' agreement." *Formento v. Encanto Bus. Park*, 154 Ariz. 495, 498 (App. 1987). But here, Ten Bridges failed to timely object to the introduction of testimony regarding the verbal agreement, thereby waiving any such objection. *See Cedic Dev. Corp. v. Sibole*, 25 Ariz. App. 185, 187–88 (1975). The evidence of the verbal agreement was admitted without objection and, after admission, no motion was made to strike it. Ten Bridges admits it did not raise any objection until its motion for a judgment as a matter of law, when it stated there was no basis to "open the four corners of the document and admit extrinsic evidence" for purposes of the breach of contract claim. As noted in *Sibole*:

> Although counsel showed an awareness of the applicability of the parol evidence rule, no intention was demonstrated by these comments that the court consider a formal, specific objection to have been made. Therefore, the court was entitled to consider parol evidence in reaching its decision, and when considered, it supplies a sufficient foundation for the trial court's decision.

*Id*. Accordingly, the court did not err in admitting evidence of the verbal agreement for an additional $5,000.

## II. Vega Soto Presented Substantial Trial Evidence of Common Law Fraud.

¶17 Ten Bridges argues Vega Soto presented insufficient evidence of fraud. In reviewing a jury's verdict, this court views the evidence and resulting inferences in the light most favorable to upholding the judgment. *Hyatt Regency Phoenix Hotel Co.*, 184 Ariz. 120, 123 (App. 1995). This court will affirm a judgment if substantial evidence was presented to permit

5

reasonable people to reach the decision reached by the jury. *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53 ¶ 13 (1998) (citing cases). "Substantial evidence" is "any relevant evidence from which a reasonable mind might draw a conclusion." *Troutman v. Valley Nat'l Bank of Ariz.*, 170 Ariz. 513, 518 (App. 1992) (citation omitted).

**¶18** The nine elements of common law fraud under Arizona law are "a material, false representation, scienter, the fraudfeasor's intent to induce reliance upon the misrepresentation, the fraud victim's ignorance of its falsity, his actual, reasonable reliance, and his consequent and proximate injury." *Parks v. Macro-Dynamics, Inc.*, 121 Ariz. 517, 520 (App. 1979). To prevail, a plaintiff must prove the nine elements of fraud with particularity, *Hall v. Romero*, 141 Ariz. 120, 124 (App. 1984), and by clear and convincing evidence, *Comerica Bank v. Mahmoodi*, 224 Ariz. 289, 291 (App. 2010). Ten Bridges argues Vega Soto failed to prove (1) a false, material representation and (2) resulting damages.

### A.      Substantial Trial Evidence Supports the Jury's Conclusion that Leckey Made a False, Material Misrepresentation to Vega Soto.

**¶19** Ten Bridges alleges the undisputed evidence shows that Leckey's statements to Vega Soto were true, and that Vega Soto did not identify any intentionally false statement Leckey made. The record, however, was sufficient for the jury to reach contrary conclusions.

**¶20** Vega Soto's complaint alleged five material misrepresentations made by Ten Bridges, through its agent Leckey: (1) that Leckey was there to help Vega Soto and provide a service, (2) that Leckey was an expert in Arizona foreclosure, (3) that Vega Soto had no chance to recover any excess proceeds on his own and would have to pay substantial attorneys' fees he could not afford, (4) that Vega Soto's only chance to recover anything was by accepting this deal with Ten Bridges and (5) that if Ten Bridges was successful in recovering the excess proceeds, it would pay Vega Soto an additional $5,000.

**¶21** Leckey emailed Vega Soto informing him that there were "excess funds related to" the property he had owned and that her company had expertise in retrieving these funds and had helped people all around the country to do so. Vega Soto testified he believed Leckey was helping him and offering him her services to retrieve the funds. Leckey testified that she understood Vega Soto believed Ten Bridges was offering to help him and providing him a service and that she did not correct him or let him

know she was in fact only interested in furthering the interests of Ten Bridges.

**¶22** Vega Soto testified that, when Leckey contacted him to discuss his options, she said "it will be almost impossible" for him to recover the excess proceeds on his own, that there were "other existing loans and liens on the property," and that she knew other cases where people had lost their excess proceeds to creditors. Leckey testified that it was Ten Bridges' business practice to independently investigate and perform a title search before contacting the previous homeowners of distressed properties and that she was aware before contacting Vega Soto that only HUD had an outstanding lien on the property. She also testified she was aware the HUD lien for was for $30,479 of the total excess proceeds.

**¶23** Leckey's email stated the process to recover the excess proceeds can be "extensive," "exhausting" and "time consuming and tedious." The email also stated the results from retrieving excess proceeds "were often less than the filing party expected." Leckey also admitted she told Vega Soto there was a tight timeline to recover the excess proceeds, even though she believed the excess proceeds would not be lost to the State for at least 3 to 5 years.

**¶24** Leckey admitted that her job was to make sure Ten Bridges beat competitors vying for Vega Soto's exceeds proceeds and that obtaining his signature on the contract was the real deadline. Leckey also admitted her job was to convince Vega Soto that $10,000 was a beneficial deal and that he should surrender his rights to the excess proceeds to Ten Bridges.

**¶25** Vega Soto testified that Leckey promised an extra $5,000 payment if Ten Bridges was able to recover the excess proceeds. He also testified she told him not to worry about the fact the contract said nothing about the extra $5,000. Leckey countered she never made any deal with Vega Soto for an extra $5,000 payment. However, she admitted she received a text message from Vega Soto nine days after signing the deed asking her to "remember the $5,000 left when [Ten Bridges] gets more money," to which she responded without addressing the $5,000 request.

**¶26** Ten Bridges alleges Leckey's words about the difficulty of applying for excess proceeds are statements of opinion and cannot form the basis of a fraud claim. In general, for a representation to "constitute actionable fraud, it must relate to either a past or existing fact. It cannot be predicated on unfulfilled promises, expressions of intention or statements concerning future events unless such were made with the present intention

7

not to perform." *Staheli v. Kauffman*, 122 Ariz. 380, 383 (1979) (citing cases). But there are exceptions to this general rule, and the issue must be dealt with on a case-by-case basis. *Page Inv. Co. v. Staley*, 105 Ariz. 562, 564 (1970).

**¶27**       An opinion can be actionable when it is accompanied by other false representations. *Id.* at 564–65. "[A]n expression of an opinion may [also] be treated as a representation of fact if the maker holds himself out as possessing superior knowledge or special information regarding the subject of the representation." *Walters v. First Fed. Sav. & Loan Ass'n of Phoenix*, 131 Ariz. 321, 325 (1982). Whether these exceptions apply depends upon the status of the parties. *Id.* "They must have adverse interests in the transaction and the maker must have special experience or training in the matter or purport to have them." *Id.*

**¶28**       Leckey's statement about the difficulty in recovering excess proceeds was only one of many of her representations made to Vega Soto on behalf of Ten Bridges. Ten Bridges and Vega Soto clearly had adverse interests in the transaction, with Ten Bridges buying the rights to Vega Soto's excess proceeds. And Leckey portrayed to Vega Soto that Ten Bridges had superior knowledge, with expertise and training, helping people all around the country recover excess proceeds. Although Leckey's misrepresentations about the difficulty in recovering excess proceeds without the help of Ten Bridges might be characterized as opinions, they were actionable under these circumstances.

**¶29**       Finally, Ten Bridges alleges Vega Soto failed to prove it made misrepresentations to him. Ten Bridges argues Leckey induced Vega Soto to sign the agreement by creating a false sense of urgency, and a false sense of urgency "will not support a fraud claim where, as here, [Vega Soto] had the opportunity to examine the agreement before signing it." But even if a false sense of urgency by itself will not support a fraud claim, the substantial evidence of various other material misrepresentations made to induce Vega Soto to sign the contract would allow the jury to conclude Leckey made false, material misrepresentations to Vega Soto. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 481 ¶¶ 8, 482 ¶ 12 & 490 ¶ 57 (2002) (noting convening a meeting on short notice with knowledge of false statements provided further support for "aiding and abetting fraud").

### B. Substantial Trial Evidence Supports the Jury's Conclusion that Vega Soto Suffered Damages.

¶30 Ten Bridges argues Vega Soto failed to prove he suffered any damages as a result of selling his rights to recover the excess proceeds of the foreclosure sale. It argues Vega Soto "was in no position to pursue the proceeds" because he testified he did not know there were excess proceeds to recover, and even if he did, he could not afford legal counsel to recover the funds. According to Ten Bridges, "evidence that [Vega Soto] would have [pursued the excess proceeds] was speculative at best."

¶31 "[C]onjecture or speculation cannot provide the basis for an award of damages." *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 186 (App. 1984). Vega Soto, however, testified he independently found out about the excess proceeds, prompting him to contact Leckey to discuss the $5,000 he believed he was owed. Because he had two years to apply to recover the excess proceeds before they were deemed abandoned, *see* A.R.S. § 33-812(L), the jury properly could conclude that, based on the trial evidence, Vega Soto would have found out about the excess proceeds with enough time to file an application to recover them. And because Vega Soto could agree with a third party for assistance in recovering the excess proceeds, A.R.S. § 33-812(P), the jury properly could conclude that his financial limitations would not have prevented him from recovering the excess proceeds. Indeed, Ten Bridges itself initially offered Vega Soto a fee splitting arrangement to recover the excess proceeds.

¶32 The trial record contains substantial evidence supporting the jury's conclusion that Vega Soto suffered damages as a result of Ten Bridges' misrepresentations.

### III. Ten Bridges Has Shown No Error in the Punitive Damages Award.

¶33 Ten Bridges argues that, even if Vega Soto properly proved his fraud claim, there was no substantial evidence to support the award of punitive damages. Punitive damages may be awarded in tort cases to punish the wrongdoer and deter others from emulating the misconduct. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330 (1986). "[A] jury may award punitive damages only if clear and convincing evidence exists that the tortfeasor possessed an 'evil mind' while engaging in aggravated and outrageous conduct. Additionally, this conduct must have proximately caused harm to the claimant to constitute a basis for punitive damages." *Hudgins v. Sw. Airlines, Co.*, 221 Ariz. 472, 486 ¶ 38 (App. 2009) (citing cases). A defendant acts with an evil mind if he "should

be consciously aware of the evil of his actions, of the spitefulness of his motives or that his conduct is so outrageous, oppressive or intolerable [so] that it creates a substantial risk of tremendous harm to others." *Linthicum*, 150 Ariz. at 330. An award of punitive damages will be affirmed "if any reasonable view of the evidence would satisfy the clear and convincing standard." *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132 (App. 1995).

**¶34**        Ten Bridges argues there is no evidence it had an "evil mind" or intentionally tried to harm Vega Soto. It also argues its conduct did not harm Vega Soto and instead benefitted him "to the tune of $10,000 he would not have otherwise had."

**¶35**        "To determine whether sufficient evidence exists that a defendant acted with an evil mind, a court examines factors such as the reprehensibility of the conduct, the severity of harm that was actually or potentially imposed and the defendant's awareness of it, the duration of the misconduct, and any concealment of the risk of harm." *Hudgins*, 221 Ariz. at 487 ¶ 40 (citing cases). "A defendant acts with the requisite evil mind when he intends to injure or defraud, or deliberately interferes with the rights of others, 'consciously disregarding the unjustifiable substantial risk of significant harm to them.'" *Hyatt Regency*, 184 Ariz. at 132 (citation omitted). Viewed in a light most favorable to sustaining the punitive damage award, the trial record would allow the jury to properly conclude Ten Bridges acted with an evil mind.

**¶36**        The jury also could conclude Ten Bridges targeted Vega Soto, who was financially vulnerable, having lost his home in a judicial foreclosure. Similarly, the jury could conclude the contract was the result of deceit, as evidenced by Leckey's misrepresentations and the practices she and Ten Bridges followed offering $10,000 to a vulnerable homeowner in exchange for a net recovery (*after* satisfying the HUD lien) of nearly $87,000. Leckey understood Vega Soto believed Ten Bridges was offering to help him, and she did not correct him or let him know her focus was furthering the interests of Ten Bridges. Leckey misrepresented the number of parties that had an interest in Vega Soto's excess proceeds, as well as the difficulty in recovering them without the help of Ten Bridges. Leckey also admitted her job was to convince Vega Soto $10,000 was a beneficial deal, despite knowing there was $117,277.39 in excess proceeds and the only lien attached to the property was for about $30,000.

¶37 Leckey admitted she had told Vega Soto there was a tight timeline to recover the money, despite knowing the excess proceeds would not be lost to the State for years. Vega Soto also testified that Leckey promised an extra $5,000 once Ten Bridges was able to recover the excess proceeds and that she told him not to worry about the fact the contract said nothing on the extra $5,000 to induce him to sign. When viewing the trial record in the light most favorable to the jury verdict for Vega Soto, it properly supports the jury's conclusion Ten Bridges acted with an evil mind. Thus, the superior court did not err in rejecting Ten Bridges' challenges to the award of punitive damages.

**IV.   The Punitive Damages Award is Neither Excessive Nor Unconstitutional.**

¶38 Ten Bridges argues that even if punitive damages were appropriate, the amount awarded was excessive, meaning it violated due process.

¶39 The Due Process Clause in the Fourteenth Amendment of the United States Constitution "imposes a substantive limit on the size of punitive damages awards." *Nardelli v. Metro. Grp. Prop. and Cas. Ins. Co.*, 230 Ariz. 592, 609 ¶ 83 (App. 2012) (citations omitted). Accordingly, the court reviews punitive damages awards de novo, "exercis[ing] exacting discretion" in reviewing the constitutional principles and acting as the "gatekeeper" over punitive damages verdicts. *See id.* at 609 ¶ 83–84.

¶40 When reviewing the constitutionality of a punitive damages award, the court considers: (1) the degree of reprehensibility of a defendant's conduct, (2) the disparity between a plaintiff's actual or potential harm and the punitive damages award and (3) the difference between the jury's punitive damages award and the authorized civil penalties in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003). The court views "the evidence in a light most favorable to upholding the jury verdict" and will affirm "if any substantial evidence exists permitting reasonable persons to reach such a result." *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 498 ¶ 83 (App. 2008) (citation omitted). Although the parties cite no authorized civil penalty in comparable cases, the court will address the other two factors below.

**A.   The Reprehensibility of Ten Bridges' Conduct.**

¶41 In analyzing reprehensibility, the court considers whether: (1) "the harm caused was physical as opposed to economic;" (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or

safety of others;" (3) "the target of the conduct had financial vulnerability;" (4) "the conduct involved repeated actions or was an isolated incident" or (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 501 ¶ 95 (citation omitted). No single factor is dispositive. *See Hudgins,* 221 Ariz. at 490 ¶ 52.

**¶42**        Here, the jury properly could conclude Ten Bridges caused economic harm to Vega Soto, who was entitled to a net award of nearly $87,000 in excess proceeds but received only $10,000. Ten Bridges targeted financially vulnerable people like Vega Soto, who had lost his home in a judicial foreclosure and did not know he could recover the excess proceeds for his equity. The conduct at hand involved repeated actions, as shown by the testimony of Ten Bridges' owner and manager, explaining he has been in the business of distressed real estate for more than ten years, and his companies, including Ten Bridges, have dealt with hundreds of homeowners. Furthermore, the harm was the result of intentional malice, trickery or deceit, as evidenced by Leckey's misrepresentations and the practices she and Ten Bridges followed offering $10,000 to a vulnerable homeowner in exchange for a net award of nearly $87,000. Thus, the record contains various reprehensible acts committed by or on behalf of Ten Bridges. These acts weigh in favor of affirming the jury's punitive damages award.

### B.        Comparing Vega Soto's Actual Harm and the Punitive Damages Award.

**¶43**        There is no bright-line ratio between compensatory and punitive damages, but "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety . . . [and] '[w]hen compensatory damages are substantial, . . . a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" *Pope,* 219 Ariz. at 503 ¶ 103 (quoting *Campbell,* 538 U.S. at 424–25).

**¶44**        Ten Bridges alleges even if Vega Soto's real harm were somehow nearly $87,000, the almost 5:1 ratio between Vega Soto's actual harm and the award is too great. The verdict returned on the fraud count, however, was a general verdict of $500,000. The verdict states the jury found the full damages to be $500,000 and does not distinguish between compensatory and punitive damages. Ten Bridges did not seek a verdict form allocating the compensatory and punitive damages associated with the fraud claim. The verdict form, without objection by Ten Bridges, used one line for damages (compensatory and punitive) for the fraud claim. It

did not allocate compensatory or punitive damages and did not contain other interrogatories allocating compensatory and punitive damages. In response to Vega Soto's request for the jury to find a specific amount of punitive damages, Ten Bridges seemed to take the position that such an inquiry was not necessary. Thus, the allocation between compensatory and punitive damages necessary to support Ten Bridges' ratio argument is not contained in the record.

¶45 Moreover, as Vega Soto correctly points out, "[t]here is nothing cited in the record showing that the jury awarded over $400,000 of punitive damages as opposed to $392,722.70 or some other amount." The only hint at how much the jury might have awarded in punitive damages is a deliberation question asking for the context of Ten Bridges' mention of $376,000 in punitive damages in its closing argument, to which Ten Bridges responded the $376,000 came directly from Vega Soto's complaint. Assuming the jury used this amount, the ratio between Vega Soto's actual harm and punitive damages would be a bit more than 3.2:1, which is not constitutionally infirm in this case. *See Pope*, 219 Ariz. at 503 ¶ 103.

## ATTORNEYS' FEES ON APPEAL

¶46 Both Ten Bridges and Vega Soto request their attorneys' fees and costs on appeal under A.R.S. §§ 12-341 and -341.01. Because Ten Bridges is not the successful party on appeal, its request is denied. Because Vega Soto is the successful party on appeal, he is awarded his reasonable attorneys' fees and taxable costs pursuant to A.R.S. §§ 12-341 and -341.01, contingent upon his compliance with ARCAP 21.

## CONCLUSION

¶47 The judgment is affirmed.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:       JR